# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Sandholm v. Kuecker*, 2012 IL 111443

---

| | |
|---|---|
| Caption in Supreme Court: | STEVE SANDHOLM, Appellant, v. RICHARD KUECKER *et al.*, Appellees. |
| Docket No. | 111443 |
| Filed | January 20, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defamation defendants who succeeded in having plaintiff ousted from his public school coaching position were not entitled to have his suit against them dismissed as a SLAPP where they did not show that it was directed solely at their petitioning activities, as opposed to genuinely seeking tort recovery. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Lee County, the Hon. David L. Jeffrey, Judge, presiding. |
| Judgment | Appellate court judgment reversed; circuit court judgment reversed; cause remanded. |

| Counsel on Appeal | Stephen T. Fieweger, of Katz, Huntoon & Fieweger, P.C., of Moline, for appellant. |
| | |

Counsel on Appeal

Stephen T. Fieweger, of Katz, Huntoon & Fieweger, P.C., of Moline, for appellant.

James W. Mertes and Magen J. Mertes, of Sterling, for appellees Richard Kuecker and Ardis Kuecker.

Jeffrey J. Zucchi, of Clark, Justen, Zucchi & Frost, Ltd., of Rockford, for appellee Michael Venier.

Linda A. Giesen, of Dixon & Giesen Law Offices, of Dixon, for appellees Glen Hughes *et al.*

Michael R. Lieber, of Ice Miller LLP, of Chicago, for appellees NRG Media, LLC and Al Knickrehm.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Clifford W. Berlow, Assistant Attorney General, of Chicago, of counsel), for intervenor-appellee.

Leah R. Bruno and Kristen C. Rodriguez, of SNR Denton US LLP, and Harvey Grossman and Adam Schwartz, all of Chicago, for *amicus curiae* American Civil Liberties Union of Illinois.

Donald Craven, of Springfield, for *amici curiae* the Illinois Press Association and the Illinois Broadcasters Association.

Peter Kurdock, of Washington, D.C., for *amicus curiae* the Public Participation Project.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.
Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1    At issue in this appeal is the applicability of the Citizen Participation Act (Act) (735 ILCS 110/1 *et seq.* (West 2008)), commonly referred to as the anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, to a lawsuit alleging intentional torts based on alleged statements by the defendants attacking the plaintiff's reputation. The circuit court dismissed plaintiff's lawsuit in its entirety, finding defendants immune from liability under the Act. The appellate court affirmed. 405 Ill. App. 3d 835. For the reasons that follow, we reverse the judgments of the appellate and circuit courts and remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 2                                        BACKGROUND

¶ 3    The plaintiff, Steve Sandholm, filed his initial complaint in the circuit court of Lee County on April 25, 2008. Plaintiff subsequently filed three amended complaints, alleging multiple counts of defamation *per se*, false light invasion of privacy, civil conspiracy to intentionally interfere with prospective business advantage, and slander *per se,* against defendants, Richard Kuecker, Ardis Kuecker, Glen Hughes, Michael Venier, Al Knickrehm, Tim Oliver, Dan Burke, David Deets, Mary Mahan-Deatherage, NRG Media, LLC, Greg Deatherage, Neil Petersen, and Robert Shomaker. Plaintiff's second amended complaint alleged the following facts.

¶ 4    Plaintiff was hired as the head basketball coach at Dixon High School beginning with the 1999-2000 school year. In the 2003-2004 school year, he was assigned the additional position of the school's athletic director. Plaintiff received positive evaluations of his job performance during his entire tenure at Dixon High School.

¶ 5    In February 2008, defendants began a campaign to have plaintiff removed as basketball coach and athletic and activities director due to their disagreement with his coaching style. Plaintiff alleged that defendants made multiple false and defamatory statements in various media as part of their campaign. Defendants Richard and Ardis Kuecker, Hughes, Venier, Oliver, Burke, Deets and Mahan-Deatherage formed a group called the "Save Dixon Sports Committee" and established a Web site called savedixonsports.com.

¶ 6    Richard Kuecker posted a letter on the Web site titled "Hostages in the Gym," dated February 28, which stated that plaintiff badgered and humiliated players and that his conduct was excessively abusive and constituted bullying. On March 8 and again on March 10, Greg Deatherage published the "Hostages in the Gym" letter on the Northern Illinois Sports Beat Web site.

¶ 7    On February 28 and 29, Shomaker sent e-mails to school board member Carolyn Brechon, stating that plaintiff had "ruined things for everyone," and that "many people tell me that [plaintiff's] half time speeches are so profanity laced that they want to leave the locker room."

¶ 8    On March 11, Venier sent an email to Dixon school board member James Hey, stating similar comments about plaintiff's bullying and abuse of players. On March 14, Richard

-3-

Kuecker sent an email to Matt Trowbridge, a reporter for the Rockford Register Star, stating that plaintiff's abusive behavior was the same as bullying; that "we were held hostage for three years"; and that plaintiff was a bad coach and an embarrassment to the community.

¶ 9    On March 19, defendants presented a petition to the Dixon school board, a copy of which was posted on the savedixonsports.com Web site. The petition stated that plaintiff abused his position of influence, exhibited a lack of positive character traits, criticized players in a way that amounted to abuse and bullying, and made demands "bordering on slavery." The petition also stated that no one, either "in-house" or "out-of-house," wanted to do business with plaintiff in his position as athletic director at Dixon High School; that plaintiff had alienated himself from all youth athletic feeder programs; and that plaintiff had "worn out his welcome in far too many circles to continue to do the complete and successful job you pay him to do." After considering the petition, the school board voted on March 19 to retain plaintiff in his positions of athletic director and head basketball coach.

¶ 10    On March 21, Venier, Richard Kuecker, Hughes, and Knickrehm appeared on WIXN Radio, AM 1460 (owned by defendant NRG Media, LLC), at the request of Knickrehm, general manager of the radio station, to discuss their dissatisfaction with the school board's decision. During the broadcast, defendants stated that plaintiff was performing adversely in his job as athletic director, that he was an embarrassment to the community, that no one wanted to do business with him, and that business owners were finding it harder to support the sports program at Dixon High School. The broadcast was posted on the savedixonsports.com Web site for republication to persons viewing the Web site from March 24 to April 10, and from April 22 to April 26. Also posted to the Web site was a "public service announcement," which was broadcast on WIXN radio. In the announcement, Venier stated that the school board had "failed miserably"; Oliver stated that plaintiff had been "getting away with this for years"; and Mahan-Deatherage stated that the problem "goes across all athletics" and was an embarrassing situation.

¶ 11    On March 21, Petersen, a former school board member, sent a letter to the school board stating that the proposed code of conduct was a "slap in the face" and that it should be directed at plaintiff "who continually demonstrates undesirable behavior and a total lack of respect for anyone." He stated further that the funding from corporate and business entities to support extracurricular programs was in jeopardy and may evaporate.

¶ 12    On several occasions in March and April 2008, Deatherage published comments about plaintiff on the Northern Illinois Sports Beat Web site and on the saukvalleynews.com Web site, including calling plaintiff a "psycho nut who talks in circles and is only coaching for his glory." Deatherage also commented that plaintiff, in his role as athletic director, was spending the sports money on the varsity basketball program to the detriment of other sports programs at Dixon High School.

¶ 13    On March 26, 2008, Ardis Kuecker posted a letter to the editor on the saukvalleynews.com Web site, questioning whether the new athletic code of conduct would force plaintiff "to stop his utilization of verbal abuse, emotional abuse, bullying and belittling–all aimed toward his players, as well as power conflicts with his fellow coaches."

¶ 14    On April 10, the members of the Save Dixon Sports Committee sent a letter to Doug Lee,

president of the Dixon school board. The letter stated that for nine years, plaintiff "tore down his players to the point of humiliation"; that the situation was akin to a "classic abuse situation" in which the abuser "tells them he loves them"; that parents and players felt they could not speak up for fear of retaliation by the coach against the players; and that plaintiff was the "exact opposite" of what an athletic director should be. On the same day, defendants posted on their Web site an open letter to the school board containing the same or similar statements about plaintiff. Also on April 10, Shomaker sent a letter to school board member Carolyn Brechon, stating that plaintiff had threatened his son, Eric.

¶ 15    On April 12, Hughes sent a letter to all members of the Dixon school board, in which he stated that plaintiff's bullying, berating, and degrading of his players, threats against them, and his "slave/dog treatment of [assistant basketball coach] John Empen" should not be tolerated, and that "evil succeeds when good people do nothing."

¶ 16    On April 16, an article was published in the Rockford Register Star, in which several defendants made comments about plaintiff. Richard Kuecker stated that plaintiff "tore down" players, told them "they're no good," belittled them, "got in their face," and shook his finger at them. Hughes stated that plaintiff had blackmailed his son, Scott, by threatening to give a bad scouting report to a college if Scott did not stop criticizing plaintiff to outsiders.

¶ 17    On April 23, the Dixon school board voted to remove plaintiff from his position as basketball coach but retained him as the school's athletic director.

¶ 18    On April 24, an article was published in the Dixon Gazette and on saukvalleynews.com in which Mahan-Deatherage made the following statement: "Why does there have to be an instance of where someone is shoved and pushed? Why can't all these instances of abuse over 10 years *** isn't that enough to fire him?"

¶ 19    In May or June 2008, Shomaker met with three officers of the Junior Dukes Football Program and told them that plaintiff had treated student athletes badly and used foul or profane language toward students.

¶ 20    Counts I through XII alleged defamation *per se* against all defendants except Petersen. Plaintiff alleged that defendants' false and defamatory statements imputed an inability to perform and/or a want of integrity in the discharge of his duties as basketball coach and athletic director; prejudiced his ability to perform his job duties; falsely imputed that plaintiff had engaged in criminal activity; and caused presumed damages to his reputation. Counts XIII through XXII, as well as count XVI, alleged false light invasion of privacy against all defendants except Petersen and Ardis Kuecker. These counts alleged that defendants' derogatory and false statements placed him in a false light before the public and were made with actual malice or with reckless disregard of the truth or falsity of the statements. Count XXIII alleged civil conspiracy to interfere with prospective business advantage against all defendants except Petersen, based on the fact that plaintiff had a reasonable expectancy to enter into a valid business relationship with the Dixon School District to continue his employment as head boys basketball coach through the 2010-2011 school year. Finally, counts XXIV and XXV alleged that Petersen's actions as an individual constituted slander *per se* and intentional interference with prospective business advantage.

¶ 21    Following the filing of plaintiff's second amended complaint, defendants filed separate

motions to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2008)). Defendants contended, among other things, that the second amended complaint constituted a SLAPP specifically prohibited by the Act. The Act applies to "any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008). The Act immunizes from liability "[a]cts in furtherance of the constitutional rights to petition, speech, association, and participation in government ***, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2008).

¶ 22    In response to the dismissal motions, plaintiff filed a responsive pleading arguing that defendants' actions were not "in furtherance of the constitutional rights to petition," and, even if they were, that such actions were "not genuinely aimed at procuring favorable government action, result or outcome." On the date of the hearing on the motions to dismiss, plaintiff filed an additional written response. He argued that the Act is unconstitutional as applied to him as well as to all public employees in the state. Plaintiff based his constitutional arguments on article I, section 12, of the Illinois Constitution (Ill. Const. 1970, art. I, § 12), which guarantees a right to a legal remedy for all injuries or wrongs received to a person's privacy or reputation, and article I, section 6 (Ill. Const. 1970, art. I, § 6), which grants individuals the right to be free from invasions of privacy. The circuit court delayed the hearing to allow defendants to respond to plaintiff's constitutional arguments.

¶ 23    Following the hearing, the circuit court issued a memorandum opinion and order dismissing plaintiff's second amended complaint in its entirety, finding defendants immune from all claims pursuant to the Act. The court did not reach the remaining grounds raised in defendants' motions to dismiss.

¶ 24    Prior to the circuit court's decision, plaintiff filed a motion for leave to file his third amended complaint, which added additional allegations in count X and an additional count XXVI for false light invasion of privacy against Shomaker. The circuit court allowed leave to file the third amended complaint only as to counts X and XXVI, finding that the remaining counts were identical to those alleged in the second amended complaint. The circuit court subsequently dismissed counts X and XXVI of plaintiff's third amended complaint on the grounds that the Act barred the claims alleged in those counts.

¶ 25    In response to defendants' collective motion for attorney fees, the circuit court awarded fees to defendants pursuant to section 25 of the Act (735 ILCS 110/25 (West 2008)), in the total amount of $54,500.78, divided into four separate amounts for the various attorneys. The court limited the award only to those fees which could be specifically verified as connected to work done on the motion under the Act.

¶ 26    Plaintiff appealed the dismissal of his complaints. Defendants, with the exception of Venier, filed cross-appeals seeking expansion of the attorney fee awards to include those fees associated with the entire defense.

¶ 27    The appellate court affirmed. 405 Ill. App. 3d 835. The court held that the Act "alters existing defamation law by providing a new, qualified privilege for any defamatory

statements communicated in furtherance of one's right to petition, speak, assemble, or otherwise participate in government *** even with actual malice." *Id*. at 851, 855. The court acknowledged that, under its construction, "the Act is broad, changing the landscape of defamation law"; however, the court held that it is the duty of the legislature, not the courts, to rewrite the statute. *Id.* at 855.

¶ 28    As applied to the facts, the court found that dismissal of plaintiff's claims was proper. The court found that defendants' acts were "genuinely aimed at procuring favorable government action, result, or outcome" because reasonable persons could expect the school board to change its initial decision to retain plaintiff after defendants' campaign placed public pressure on the board. *Id.* at 862-63. The school board decision was a "government process" under the plain language of the Act. Thus, defendants were acting in furtherance of their rights to participate in government with the goal to obtain favorable government action. *Id.* at 864. The court further held it was "undisputed that plaintiff's lawsuit was based on or in response to defendants' 'acts in furtherance.' " *Id.*

¶ 29    The court next rejected plaintiff's constitutional arguments. With regard to the right to a remedy under article I, section 12, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 12), the court held that the right to remedy clause is an expression of philosophy rather than a mandate for a specific remedy. *Id.* at 851. In the context of the Act, the court held, the legislature properly exercised its inherent power to repeal or change the common law by granting a qualified privilege for speech made in the exercise of the right to participate in government. *Id.* at 852. The court found plaintiff's equal protection argument to be equally unavailing. The court disagreed with the plaintiff that the Act places public employees in a special category because the Act applies, on its face, to *any* moving party whose alleged acts were in furtherance of the moving party's rights to petition, speak, assemble, or otherwise participate in government. *Id.* Finally, the court affirmed the award of attorney fees by the circuit court, limited to those fees associated with the motion to dismiss on grounds based on the Act. *Id.* at 869.

¶ 30    This court allowed plaintiff's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We granted leave to the State to intervene in the cause as an intervenor-appellee, and we allowed the American Civil Liberties Union of Illinois, the Illinois Press Association, the Illinois Broadcasters Association, and the Public Participation Project to submit an *amicus curiae* brief in support of defendants.

¶ 31                                    ANALYSIS
¶ 32                            I. Citizen Participation Act
¶ 33    In August 2007, Illinois joined more than 20 other states[1] in enacting anti-SLAPP legislation, in the form of the Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2008)). The term "SLAPP" was coined by two professors at the University of Denver,

---

[1]See Mark J. Sobczak, Comment, *SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 559-60, 576 n.149 (2008).

George W. Pring and Penelope Canan, who conducted the seminal study on this type of lawsuit. George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPs"): An Introduction for Bench, Bar and Bystanders*, 12 Bridgeport L. Rev. 937 (1992). "SLAPPs, or 'Strategic Lawsuits Against Public Participation,' are lawsuits aimed at preventing citizens from exercising their political rights or punishing those who have done so." *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 630 (2010) (citing generally Penelope Canan & George W. Pring, *Strategic Lawsuits Against Public Participation*, 35 Soc. Probs. 506 (1988)). "SLAPPs use the threat of money damages or the prospect of the cost of defending against the suits to silence citizen participation." *Walsh*, 238 Ill. 2d at 630 (citing 735 ILCS 110/5 (West 2008)). The paradigm SLAPP suit is "one filed by developers, unhappy with public protest over a proposed development, filed against leading critics in order to silence criticism of the proposed development." *Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523, 525 (N.D. Ill. 1990). A SLAPP is "based upon nothing more than defendants' exercise of their right, under the first amendment, to petition the government for a redress of grievances." *Hogan*, 740 F. Supp. at 525.

¶ 34　　SLAPPs are, by definition, meritless. John C. Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPs*, 26 Loy. L.A. L. Rev. 395, 396 (1993). Plaintiffs in SLAPP suits do not intend to win but rather to chill a defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction. *Id*. at 403-05. "In fact, defendants win eighty to ninety percent of all SLAPP suits litigated on the merits." *Id.* at 406. While the case is being litigated in the courts, however, defendants are forced to expend funds on litigation costs and attorney fees and may be discouraged from continuing their protest activities. *Id.* at 404-06.

¶ 35　　"The idea is that the SLAPP plaintiff's goals are achieved through the ancillary effects of the lawsuit itself on the defendant, not through an adjudication on the merits. Therefore, the plaintiff's choice of what cause of action to plead matters little." Mark J. Sobczak, Comment, *SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 561 (2008). SLAPPs "masquerade as ordinary lawsuits" and may include myriad causes of action, including defamation, interference with contractual rights or prospective economic advantage, and malicious prosecution. Kathryn W. Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope*, 33 Loy. L.A. L. Rev. 801, 804-05 (2000). Because winning is not a SLAPP plaintiff's primary motivation, the existing safeguards to prevent meritless claims from prevailing were seen as inadequate, prompting many states to enact anti-SLAPP legislation. *Id.* at 805. These statutory schemes commonly provide for expedited judicial review, summary dismissal, and recovery of attorney fees for the party who has been "SLAPPed." *Id.*

¶ 36　　These characteristics of SLAPPs are reflected in the language of the Act, particularly section 5, which sets forth the public policy considerations underlying the legislation:

　　　　"§ 5. Public Policy. Pursuant to the fundamental philosophy of the American constitutional form of government, it is declared to be the public policy of the State of Illinois that the constitutional rights of citizens and organizations to be involved and participate freely in the process of government must be encouraged and

safeguarded with great diligence. The information, reports, opinions, claims, arguments, and other expressions provided by citizens are vital to effective law enforcement, the operation of government, the making of public policy and decisions, and the continuation of representative democracy. The laws, courts, and other agencies of this State must provide the utmost protection for the free exercise of these rights of petition, speech, association, and government participation.

Civil actions for money damages have been filed against citizens and organizations of this State as a result of their valid exercise of their constitutional rights to petition, speak freely, associate freely, and otherwise participate in and communicate with government. There has been a disturbing increase in lawsuits termed 'Strategic Lawsuits Against Public Participation' in government or 'SLAPPs' as they are popularly called.

The threat of SLAPPs significantly chills and diminishes citizen participation in government, voluntary public service, and the exercise of these important constitutional rights. This abuse of the judicial process can and has been used as a means of intimidating, harassing, or punishing citizens and organizations for involving themselves in public affairs.

It is in the public interest and it is the purpose of this Act to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government; to protect and encourage public participation in government to the maximum extent permitted by law; to establish an efficient process for identification and adjudication of SLAPPs; and to provide for attorney's fees and costs to prevailing movants." 735 ILCS 110/5 (West 2008).

¶ 37 Section 15 of the Act describes the type of motion to which the Act applies:

"This Act applies to any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.

Acts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2008).

¶ 38 A "claim" under the Act includes "any lawsuit, cause of action, claim, cross-claim, counterclaim, or other judicial pleading or filing alleging injury." 735 ILCS 110/10 (West 2008). "Government" is defined as "a branch, department, agency, instrumentality, official, employee, agent, or other person acting under color of law of the United States, a state, a subdivision of a state, or another public authority including the electorate." *Id.*

¶ 39 When a motion to dismiss is filed pursuant to the Act, "a hearing and decision on the motion must occur within 90 days after notice of the motion is given to the respondent." 735 ILCS 110/20(a) (West 2008). Discovery is suspended pending a decision on the motion. 735 ILCS 110/20(b) (West 2008). However, "discovery may be taken, upon leave of court for

good cause shown, on the issue of whether the movants [*sic*] acts are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." *Id.* "The court shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." 735 ILCS 110/20(c) (West 2008).

¶ 40    Section 25 provides that the court "shall award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2008). Section 30(b) provides that the Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2008).

¶ 41    In construing the statute, we bear in mind the familiar principles of statutory construction. Our primary objective is to ascertain and give effect to the intent of the legislature. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). The most reliable indicator of the legislative intent is the language of the statute, which should be given its plain and ordinary meaning. *Id.* All provisions of a statute should be viewed as a whole. Accordingly, words and phrases should be interpreted in light of other relevant provisions of the statute and should not be construed in isolation. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 60 (2006). We also presume, in interpreting the meaning of the statutory language, that the legislature did not intend absurdity, inconvenience, or injustice. *Id.* Our review of an issue of statutory interpretation is *de novo. Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003).

¶ 42    Plaintiff argues that the Act is intended to apply only to actions based *solely* on the defendants' petitioning activities and does not immunize defamation or other intentional torts. In other words, if the plaintiff's intent in bringing suit is to recover damages for alleged defamation and not to stifle or chill defendants' rights of petition, speech, association, or participation in government, it is not a SLAPP and does not fall under the purview of the Act. We agree. Looking at the statute in its entirety, it is clear that the legislation is aimed at discouraging and eliminating meritless, retaliatory SLAPPs, as they traditionally have been defined.

¶ 43    In deciding whether a lawsuit should be dismissed pursuant to the Act, a court must first determine whether the suit is the type of suit the Act was intended to address. Under section 15, a claim is subject to dismissal where it is "based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008). This description of a claim subject to the Act must not be construed in isolation but in the context of the purposes described in the public policy section. One of the Act's stated purposes is to "establish an efficient process for identification and adjudication of SLAPPs." 735 ILCS 110/5 (West 2008). In the service of that goal, the Act describes a SLAPP suit as one which "chills and diminishes citizen participation in government, voluntary public service, and the exercise of these important constitutional rights." *Id.* The Act further identifies a SLAPP as an "abuse of the judicial process" which "can and has been used as a means of intimidating, harassing, or punishing citizens and organizations for involving themselves in public affairs." *Id.*

¶ 44     The description of a SLAPP in section 5 mirrors the traditional definition of a SLAPP as a meritless lawsuit intended to chill participation in government through delay, expense, and distraction. Indeed, this court has recognized that the "purpose of the Act is to give relief, including monetary relief, to citizens who have been victimized by *meritless, retaliatory* SLAPP lawsuits because of their 'act or acts' made 'in furtherance of the constitutional rights to petition, speech, association, and participation in government.' " (Emphasis added.) *Walsh*, 238 Ill. 2d at 633 (quoting 735 ILCS 110/15 (West 2008)).

¶ 45     In light of the clear legislative intent expressed in the statute to subject only meritless, retaliatory SLAPP suits to dismissal, we construe the phrase "based on, relates to, or is in response to" in section 15 to mean *solely* based on, relating to, or in response to "any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008). Stated another way, where a plaintiff files suit genuinely seeking relief for damages for the alleged defamation or intentionally tortious acts of defendants, the lawsuit is not solely based on defendants's rights of petition, speech, association, or participation in government. In that case, the suit would not be subject to dismissal under the Act. It is clear from the express language of the Act that it was not intended to protect those who commit tortious acts and then seek refuge in the immunity conferred by the statute.

¶ 46     The Massachusetts Supreme Court reached a similar conclusion in interpreting that state's anti-SLAPP law. See *Duracraft Corp. v. Holmes Products Corp.*, 691 N.E.2d 935 (Mass. 1998). The Massachusetts anti-SLAPP statute provides, in part:

> "In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are *based on* said party's exercise of its right to petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. The court shall advance any such special motion so that it may be heard and determined as expeditiously as possible. The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (Emphasis added.) Mass. Gen. Laws ch. 231, § 59H (1994).

¶ 47     The court held that, "[d]espite the apparent purpose of the anti-SLAPP statute to dispose expeditiously of meritless lawsuits that may chill petitioning activity, the statutory language fails to track and implement such an objective." *Duracraft Corp.*, 691 N.E.2d at 943. Accordingly, the court adopted a construction of " 'based on' that would exclude motions brought against meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated." *Id*. The court held that "[t]he special movant who 'asserts' protection for its petitioning activities would have to make a threshold showing through the pleadings and affidavits that the claims against it are 'based on' the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Id*. Imposing this requirement on special movants under the statute would, according to the

court, "serve to distinguish meritless from meritorious claims, as was intended by the Legislature." *Id.*

¶ 48 Our construction of the phrase "based on, relates to, or is in response to," in section 15 similarly allows a court to identify meritless SLAPP suits subject to the Act. This interpretation also serves to ameliorate the "particular danger inherent in anti-SLAPP statutes *** that when constructed or construed too broadly in protecting the rights of defendants, they may impose a counteractive chilling effect on prospective plaintiffs' own rights to seek redress from the courts for injuries suffered." Mark J. Sobczak, Comment, *SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 575 (2008).

¶ 49 Furthermore, construing the Act to apply only to meritless SLAPPs accords with another express goal in section 5: "to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government." 735 ILCS 110/5 (West 2008). The Act's intent to "strike a balance" recognizes that a solution to the problem of SLAPPs must not compromise either the defendants' constitutional rights of free speech and petition, or plaintiff's constitutional right of access to the courts to seek a remedy for damage to reputation. See John C. Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPs*, 26 Loy. L.A. L. Rev. 395, 397-98 (1993) ("Plaintiffs must be able to bring suits with reasonable merit and defendants must be protected from entirely frivolous intimidation suits designed to chill legitimate participation in public affairs.").

¶ 50 We believe that, had the legislature intended to radically alter the common law by imposing a qualified privilege on defamation within the process of petitioning the government, it would have explicitly stated its intent to do so. See *In re D.F.*, 208 Ill. 2d 223, 235 (2003). The legislative history of the Act further supports our conclusion that the legislature intended to target only meritless, retaliatory SLAPPs and did not intend to establish a new absolute or qualified privilege for defamation. The sponsor of the bill in the Senate, Senator Cullerton, stated that the bill was intended to "address the concern that certain lawsuits that could be filed that significantly would chill and diminish citizen participation in government or voluntary public service or the exercise of those constitutional rights." 95th Ill. Gen. Assem., Senate Proceedings, April 20, 2007, at 15 (statements of Senator Cullerton). Senator Cullerton then gave an example of the type of suit targeted by the bill:

> "[L]et's say a community organization makes recommendations to a local alderman concerning zoning changes. They just give advice, then the party that might not agree with that decision, the vote of the alderman, they–that person, that landowner would file a lawsuit, not just against the municipality, but also against the community organization that gave the advice. Even though all they were doing was giving advice to their elected officials. So, that's what the purpose of the bill is." 95th Ill. Gen. Assem., Senate Proceedings, April 20, 2007, at 15-16 (statements of Senator Cullerton).

The House sponsor, Representative Franks, also described a scenario as an example of a

SLAPP:

> "I can tell you in my county, it'd be in the Village of Richmond, there was [*sic*] two (2) gentlemen running for trustees who were ... who won but they were sued by a developer, threatened with bankruptcy, not being able to pay their legal fees, even though the ... the developer's lawsuit was thrown out on three (3) separate occasions and that would stop the type of abuse." 95th Ill. Gen. Assem., House Proceedings, May 31, 2007, at 58 (statements of Representative Franks).

¶ 51    The legislators' statements further support our interpretation that the Act was aimed solely at traditional, meritless SLAPPs. There was no discussion in the legislative debates about establishing a new privilege for defamation. We recognize that the legislature has the inherent power to repeal or change the common law and may do away with all or part of it. See, *e.g.*, *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 519-20 (2000) ("passage of the Tort Immunity Act constituted an exercise of the General Assembly of its broad power to determine whether a statute that restricts or alters an existing remedy is reasonably necessary to promote the general welfare"). We simply do not believe that, in enacting the anti-SLAPP statute, the legislature intended to abolish an individual's right to seek redress for defamation or other intentional torts, whenever the tortious acts are in furtherance of the tortfeasor's rights of petition, speech, association, or participation in government. Dismissal of a lawsuit pursuant to the Act is a drastic and extraordinary remedy. Not only is a suit subject to cursory dismissal within 90 days of the motion being filed, but the plaintiff is prohibited from conducting discovery, except through leave of court, and is required to pay defendant's attorney fees incurred in connection with the motion. In light of the severe penalties imposed on a plaintiff under the Act, we will not read into the statute an intent to establish a new, qualified privilege absent an explicit statement of such intent.

¶ 52    Several of the defendants concede that the Act applies only to meritless lawsuits, but they argue that the so-called "sham exception" set forth in the second clause of section 15 is sufficient to separate SLAPPs from meritorious suits. This exception states that "[a]cts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, *regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome.*" (Emphasis added.) 735 ILCS 110/15 (West 2008). Defendants argue that, where petitioning activities are genuinely aimed at procuring a favorable governmental result, a plaintiff's lawsuit for alleged defamation occurring in the course of petitioning is, by definition, without merit. Defendants' argument is unpersuasive.

¶ 53    The sham exception tests the genuineness of the *defendants'* acts; it says nothing about the merits of the plaintiff's lawsuit. It is entirely possible that defendants could spread malicious lies about an individual while in the course of genuinely petitioning the government for a favorable result. For instance, in the case at bar, plaintiff alleges that defendants defamed him by making statements that plaintiff abused children, did not get along with colleagues, and performed poorly at his job. Assuming these statements constitute actionable defamation, it does not follow that defendants were not *genuinely* attempting to achieve a favorable governmental result by pressuring the school board into firing the

plaintiff.[2] If a plaintiff's complaint genuinely seeks redress for damages from defamation or other intentional torts and, thus, does not constitute a SLAPP, it is irrelevant whether the defendants' actions were "genuinely aimed at procuring favorable government action, result, or outcome." Thus, plaintiff's suit would not be subject to dismissal under the Act.

¶ 54    Turning to the merits in the case at bar, at issue is whether plaintiff's complaint should have been dismissed pursuant to the Act. At the outset, we note that all of the motions to dismiss in this case were filed under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2008)). A section 2-615 motion to dismiss challenges only the legal sufficiency of a complaint and alleges only defects on the face of the complaint. *Board of Directors of Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 423 (1999). A motion to dismiss based on the immunity conferred by the Act, however, is more appropriately raised in a section 2-619(a)(9) motion, which allows for dismissal when the claim asserted against the defendant is "barred by other affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2-619(a)(9) (West 2008)). *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 641 (2010) (Freeman, J., specially concurring, joined by Thomas and Burke, JJ.). Immunity from tort liability pursuant to statute is an affirmative matter properly raised in a section 2-619 motion to dismiss. See, *e.g.*, *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003) (construing section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201 (West 1994)). Since plaintiff has not been prejudiced by the motions to dismiss having been filed under section 2-615, we will treat the parts of the motions asserting immunity under the Act as if they had been filed under section 2-619(a)(9). See *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002); *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 541-42 (1991).

¶ 55    A motion to dismiss under section 2-619(a) admits the legal sufficiency of the plaintiff's claim but asserts certain defects or defenses outside the pleadings which defeat the claim. *Wallace*, 203 Ill. 2d at 447. When ruling on the motion, the court should construe the pleadings and supporting documents in the light most favorable to the nonmoving party. *Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008). The court must accept as true all well-pleaded facts in plaintiff's complaint and all inferences that may reasonably be drawn in plaintiff's favor. *Morr-Fitz, Inc. v Blagojevich*, 231 Ill. 2d 474, 488 (2008). The question on appeal is "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). Our review is *de novo. Id.*

¶ 56    The procedure set forth in the Act provides the proper framework for our analysis. Section 15 requires the moving party to demonstrate that the plaintiff's complaint is "based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government." 735 ILCS 110/15 (West 2008); *Walsh*, 238 Ill. 2d at 635. If the moving party

---

[2]Plaintiff does not argue in this court that defendants' acts were not "genuinely aimed at procuring favorable government action, result, or outcome."

has met his or her burden of proof, the burden then shifts to the responding party to produce "clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability" under the Act. 735 ILCS 110/20(c) (West 2008); *Walsh*, 238 Ill. 2d at 636-37. Thus, defendants had the initial burden of proving that plaintiff's lawsuit was solely "based on, relate[d] to, or in response to" their acts in furtherance of their rights of petition, speech or association, or to participate in government. Only if defendants have met their burden does the plaintiff have to provide clear and convincing evidence that defendants' acts are not immunized from liability under the Act.

¶ 57    We conclude, based on the parties' pleadings, that plaintiff's lawsuit was not solely based on, related to, or in response to the acts of defendants in furtherance of the rights of petition and speech. Plaintiff's suit does not resemble in any way a strategic lawsuit intended to chill participation in government or to stifle political expression. It is apparent that the true goal of plaintiff's claims is not to interfere with and burden defendants' free speech and petition rights, but to seek damages for the personal harm to his reputation from defendants' alleged defamatory and tortious acts. Defendants have not met their burden of showing that plaintiff's suit was based solely on their petitioning activities.

¶ 58    We emphasize that we express no opinion on the actual merits of plaintiff's causes of action. We simply hold that plaintiff's lawsuit is not a SLAPP within the meaning of the Act and, thus, is not subject to dismissal on that basis. Upon remand, the circuit court should consider any remaining bases for dismissal raised by defendants, including that defendants' statements constitute protected opinion, that the statements are protected under the fair reporting privilege, and that plaintiff's complaint failed to adequately plead the required elements, including actual malice.

¶ 59                                    II. Constitutional Issues

¶ 60    Plaintiff further contends that the Act as a whole is unconstitutional under various provisions of the United States and Illinois Constitutions. See Ill. Const. 1970, art. I, § 12 (right to remedy and justice); Ill. Const. 1970, art. I, § 4 (freedom of speech); Ill. Const. 1970, art. I, § 5 (right to apply for redress of grievances); Ill. Const. 1970, art. I, § 6 (right to be secure against unreasonable invasions of privacy); Ill. Const. 1970, art. I, § 2 (due process and equal protection); U.S. Const., amend. XIV (due process and equal protection). All of plaintiff's arguments alleging that the Act is unconstitutional are based on the assumption that the Act establishes a privilege for defendants who engage in defamatory acts in the process of petitioning the government. Because we hold that the legislature did not intend to establish such a privilege, we do not find the statute unconstitutional under any of the grounds raised by plaintiff.

¶ 61                                    III. Attorney Fees

¶ 62    Defendants, with the exception of Venier, appeal that part of the appellate court's judgment affirming the circuit court's award of attorney fees. This claim was raised in a cross-appeal to the appellate court. Jurisdiction in this court is pursuant to Supreme Court

Rule 318(a) (Ill. S. Ct. R. 318(a) (eff. Jan. 1, 1967)). *Poindexter v. State ex rel. Department of Human Services*, 229 Ill. 2d 194, 205 n.4 (2008) (allowance of one party's petition for leave to appeal brings before this court the other party's requests for cross-relief).

¶ 63 Because we are reversing the appellate court's judgment affirming the dismissal of plaintiff's complaints under the Act, our resolution of the attorney fee issue will not affect the parties to this case. Therefore, the issue is moot. However, we will address the issue under the public interest exception to the mootness doctrine because the question is of a public nature in that any individual or legal entity in the state may be subject to the Act; the issue is likely to recur in future cases; and a definitive decision by this court will provide guidance to the lower courts in deciding which attorney fees are appropriate under the Act. See *Goodman v. Ward*, 241 Ill. 2d 398, 404-05 (2011).

¶ 64 Turning to the merits, Illinois follows the "American rule," which prohibits prevailing parties from recovering their attorney fees from the losing party, absent express statutory or contractual provisions. *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill. 2d 560, 572 (2000). Accordingly, statutes which allow for such fees must be strictly construed as they are in derogation of the common law. *Carson Pirie Scott & Co. v. State of Illinois Department of Employment Security*, 131 Ill. 2d 23, 49 (1989). Although the statute provides that "[t]his Act shall be construed liberally to effectuate its purposes and intent fully" (735 ILCS 110/30(b) (West 2008)), this statement of construction applies to the substantive provisions of the Act and not to the fee-shifting provision in section 25. This issue involves the interpretation of a statute and, thus, is subject to *de novo* review. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

¶ 65 Section 25 of the Act provides: "The court shall award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2008). In an apparent misreading of the plain language of the statute, defendants contend that the phrase "incurred in connection with the motion" does not mean solely in connection with the motion filed under the Act. Rather, they interpret the phrase to mean that prevailing movants are entitled to attorney fees incurred in connection with the entire defense, including attacking the allegations on the face of the complaint and raising other defenses and privileges unrelated to the Act. They base their argument on the statute's definition of a "motion," which includes "any motion to dismiss, for summary judgment, or to strike, or any other judicial pleading filed to dispose of a judicial claim." 735 ILCS 110/10 (West 2008). In our view, the language in section 25 is unambiguous and supports only one interpretation. Attorney fees "incurred in connection with the motion" include only those fees which can specifically be delineated as incurred in connection with the motion to dismiss filed under the Act.

¶ 66 Defendants' reliance on *Hensley v. Eckerhart*, 461 U.S. 424 (1983), to support their position on the fee issue, is misplaced. There, the United States Supreme Court interpreted 42 U.S.C. § 1988, which provides that in federal civil rights actions, " 'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.' " *Id.* at 426 (quoting 42 U.S.C. § 1988). The Court held that, where a plaintiff presents several claims for relief in the same lawsuit, and only some of the claims for relief are successful, attorney fees may be allowed for all claims involving

a common core of facts or based on related legal theories. *Id.* at 434-35. The fee-shifting statute in the instant case obviously differs from the statute in *Hensley*, in that it specifically provides that only fees "incurred in connection with the motion" filed under the Act are allowed to a prevailing movant. Therefore, any fees incurred which are not specifically connected to the motion to dismiss pursuant to the Act are not allowed.

¶ 67        We note further that plaintiff presents an argument in his reply brief challenging the jurisdiction of the circuit court to award fees under the statute.[3] He argues that the circuit court lost jurisdiction to dismiss his complaints and to award attorney fees to defendants when it ruled on the motions to dismiss more than 90 days after the motions were filed. See 735 ILCS 110/20(a) (West 2008) ("On the filing of any motion as described in Section 15, a hearing and decision on the motion must occur within 90 days after notice of the motion is given to the respondent."). Plaintiff asserts that the circuit court's failure to comply with the 90-day requirement caused it to lose jurisdiction of the case. The argument lacks merit. Nowhere in the Act does it state that the circuit court loses jurisdiction when it fails to rule on a motion to dismiss within 90 days of its filing. There is no other support for plaintiff's conclusion that the circuit court's jurisdiction is dependent upon compliance with the 90-day time limit in the Act. Moreover, plaintiff himself was responsible for the delay in this case by filing a last-minute responsive pleading on the date of the hearing on the dismissal motions. Accordingly, we reject plaintiff's jurisdictional challenge to the circuit court's rulings.

¶ 68                                    CONCLUSION

¶ 69        For the foregoing reasons, the judgments of the appellate court and the circuit court are reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 70        Appellate court judgment reversed;

¶ 71        circuit court judgment reversed;

¶ 72        cause remanded.

---

[3]Plaintiff first raised the jurisdictional argument in his motion for reconsideration in the trial court but did not raise it in the appellate court. Nevertheless, a lack of subject matter jurisdiction may be raised at any time, in any court, either directly or collaterally. *Fredman Brothers Furniture Co. v. Department of Revenue*, 109 Ill. 2d 202, 215 (1985).