# Illinois Official Reports

## Appellate Court

---

### *Rehfield v. Diocese of Joliet*, 2019 IL App (3d) 180354

---

| | |
|---|---|
| Appellate Court Caption | MARY REHFIELD, Plaintiff-Appellant, v. DIOCESE OF JOLIET, Defendant-Appellee. |
| District & No. | Third District<br>No. 3-18-0354 |
| Filed | December 10, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 17-L-1000; the Hon. Raymond E. Rossi, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Julie B. Porter and Kyle A. Palazzolo, of Salvatore Prescott & Porter, PLLC, of Evanston, for appellant.<br><br>Nicholas Anaclerio Jr. and Caralyn M. Olie, of Vedder Price P.C., of Chicago, for appellee. |
| Panel | JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Presiding Justice Schmidt and Justice Carter concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 2012, the plaintiff, Mary Rehfield, was hired by the defendant, the Diocese of Joliet (Diocese), as the principal of St. Raphael Catholic School. In 2017, the Diocese terminated Rehfield following a number of issues that arose with a parent of a student. Rehfield filed a two-count complaint against the Diocese alleging retaliatory discharge and violation of the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). The Diocese filed a combined motion to dismiss, which the trial court granted. Rehfield appeals.

¶ 2                                                    FACTS

¶ 3    In November 2017, Rehfield filed an action against the Diocese initially only alleging a single count of retaliatory discharge. The following relevant facts were set forth in her complaint.

¶ 4    In 2012, Rehfield was hired as the principal of St. Raphael Catholic School, which was operated by St. Raphael Parish, an agent of the Diocese. Rehfield reported to Father Daniel Bachner, an ordained Roman Catholic priest and pastor of St. Raphael Parish. Beginning with Rehfield's employment in 2012, Rehfield and the Diocese entered into one-year employment contracts. Rehfield's annual reviews stated that she was a good communicator, worked well with others, and invited and expected an atmosphere to reach one's highest potential.

¶ 5    In January 2016, a teacher at the school was contacted by the mother of one of her students and was told the student was being bullied. The teacher addressed the issue and believed the issue was resolved. Soon thereafter, the teacher received an e-mail from the same student's father, William MacKinnon, wherein he wanted the teacher to ensure that his daughter was no longer being bullied. The teacher found the e-mail to be rude in tone, but not threatening, and notified Rehfield of the correspondence. Rehfield notified Father Bachner of the e-mail. Father Bachner advised Rehfield to respond to MacKinnon directly and ask that all future communication be directed to Rehfield in a collegial manner. Rehfield complied with Father Bachner's direction. MacKinnon responded to Rehfield and apologized for the tone of his e-mail.

¶ 6    Soon thereafter, MacKinnon sent several additional e-mails to the same teacher. The teacher informed Rehfield of these e-mails. Rehfield perceived the e-mails as a potential threat. Rehfield consulted Father Bachner and, with his approval, notified the police of MacKinnon's communication. The police concluded that no further action was warranted at that time. One month later, Rehfield received what she perceived to be a threatening e-mail from MacKinnon and notified the police. Under the advice of the police, Rehfield, with Father Bachner's approval, distributed a photo of MacKinnon to faculty and staff at the school with instructions to call the police if MacKinnon was seen on campus.

¶ 7    Nearly a year later, in February 2017, Father Bachner received a voicemail from MacKinnon. The voicemail was several minutes long and described as a rant concerning priests and the church. The threat in the voicemail was directed toward Father Bachner. When Rehfield learned of the voicemail, she contacted the police and requested that they review the matter. As a result, the police issued an arrest warrant for MacKinnon.

¶ 8    Following the issuance of the arrest warrant, Rehfield consulted with Father Bachner, superintendent Father John Belmonte, and the police. Based on these communications,

Rehfield again distributed a photograph of MacKinnon to staff at the school and informed them to call the police if they saw him. Rehfield also distributed the photograph to staff at the church, telling them the same. The police and Father Bachner advised Rehfield that it was unnecessary and inappropriate to communicate about the matter with parents under the circumstances.

¶ 9 Due to the public nature of the issuance of the arrest warrant, the local press obtained information about MacKinnon's actions through public records. In May 2017, the Naperville Sun ran a story called "Man vowed to 'terrorize' Naperville school: authorities." The story inaccurately stated, among other things, that MacKinnon left the message for Rehfield and that the message contained threats to terrorize the school and its staff. Concerned parents contacted Rehfield and others associated with the school. After consulting with Father Bachner, Father Belmonte, and others, Rehfield sent a letter to parents explaining the situation with MacKinnon.

¶ 10 An open meeting was scheduled to address this situation with parents. Before the meeting, Rehfield, Father Bachner, Father Belmonte, Assistant Principal Jen Timmons, Diocese administrator Mike Bava, and Diocese attorney Maureen Harton discussed the agenda for the open meeting and the message Rehfield should relay to parents. The open meeting was described as volatile, explosive, and aggressive toward Rehfield. Some parents expressed anger that they were not informed of the situation earlier and some called for Rehfield's termination.

¶ 11 In June 2017, the Diocese terminated Rehfield's employment contract for the remainder of the 2016-17 school year and notified Rehfield that she would not be able to lead the school the following year even though she had already accepted a contract for the 2017-18 school year. Rehfield was shocked at the Diocese's actions. Rehfield alleged that Father Bachner agreed that she would remain principal at the school until she turned 70 years old. At the time Rehfield filed her complaint, she was 66 years old.

¶ 12 Rehfield argued that she consistently consulted with the Diocese regarding the correct action to taken in response to MacKinnon but, despite the approval she received to take action and contact the police, the Diocese unlawfully retaliated against her when the information became public. She believed her actions were necessary under the law and to protect her students. Rehfield also argued other staff and faculty members were likely to be more reluctant to come forward and report potentially unlawful or criminal conduct.

¶ 13 Rehfield alleged that she suffered significant financial and emotional distress and feared she might not be able to find new employment in light of her termination. Her doctor prescribed her anxiety medication and recommended that she regularly see a psychologist. Rehfield had serious concerns about how she would meet her and her husband's medical needs. She attempted to secure alternative employment but was unsuccessful. Given her age, she did not anticipate being able to find another job.

¶ 14 In December 2017, the Diocese filed a combined motion to dismiss Rehfield's complaint. The Diocese argued, pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2016)), Rehfield's complaint for retaliatory discharge should be dismissed because her employment was pursuant to an employment contract and retaliatory discharge claims are only available to at-will employees. Second, under section 2-619(a)(9) of the Code (*id.* § 2-619(a)(9)), the Diocese again reiterated that Rehfield was a contractual employee and not able to claim retaliatory discharge. The Diocese also argued that Rehfield's complaint should be dismissed pursuant to the doctrine of ecclesiastical abstention because she was

employed in a ministerial role and, for that reason, the Diocese had the discretion to manage and terminate her employment without court interference.

¶ 15 Attached to the Diocese's combined motion to dismiss were affidavits from Father Bachner and Nancy Siemers, the director of human resources for the Diocese. Father Bachner's affidavit provided that Rehfield was a contractual employee and she was never an employee at will. Each of Rehfield's employment contracts specified duration of time, compensation, and other terms of the agreement. During the 2016-17 school year, when he relieved Rehfield of her employment responsibilities, she was under contract. The 2016-17 contract ran from July 1, 2016, through June 30, 2017. Rehfield was terminated on June 9, 2017. However, St. Raphael Parish continued to pay Rehfield all compensation under the terms of her 2016-17 contract. Additionally, at the time of these filings, the St. Raphael Parish continued to pay Rehfield for the 2017-18 contract that she accepted prior to her termination.

¶ 16 Father Bachner's affidavit also provided excerpts from the Diocese's "Handbook of School Policies" that was incorporated by reference into Rehfield's employment contracts. The handbook set forth the following qualifications for principal:

"A person seeking a position as principal in the elementary schools of the Diocese of Joliet shall be a committed, practicing Catholic. In addition she or he shall possess, at a minimum the following:

> a commitment to nurturing the Catholic Identity of the school

> a Master's Degree in education with an emphasis or endorsement in administration, supervision or curriculum

> an administrative certificate Type 75 from the State of Illinois

> at least five years teaching experience, preferably in a Catholic school; with knowledge and exposure that is sufficiently broad to provide an understanding of the preschool through grade eight structure; and

> the ability to function as the spiritual and educational leader in an elementary school."

¶ 17 The handbook assigned the following responsibilities to the principal:

"> providing an atmosphere in the school which is identifiably Catholic

> developing and participating in ongoing programs to insure religious and professional growth of the staff

> establishing an instructional program which includes religious education to meet the needs of students

> assisting teachers in achieving the goals of Catholic education through supervision and classroom visitation

> hiring qualified teachers and providing them with effective leadership

> evaluating teacher performance according to diocesan procedures

> fostering good communication with parents, parish community and other publics to promote good will

> attending professional meetings, diocesan meetings and regional meetings

> sending required reports and requested information to the Catholic Schools Office and/or other appropriate agencies

> maintaining current student and school records

- 4 -

> developing the school budget

> serving as the executive officer of the local school board

> giving frequent reports to the pastor, local board and parents regarding progress of the school, its activities and its students

> insuring that maintenance of the building, health, safety and well-being of students and teachers be maintained."

¶ 18    Siemers's affidavit reiterated that Rehfield was always a contractual employee, she was fully compensated under the 2016-17 contract, and St. Raphael Parish continued to pay her under the 2017-18 contract.

¶ 19    In February 2018, Rehfield amended her complaint to add a count pursuant to the Whistleblower Act (740 ILCS 174/1 *et seq.* (West 2016)). Rehfield reiterated that, when she contacted the police regarding MacKinnon's threats, she believed she was doing the right thing to protect her students and it was necessary under the law. Rehfield also reiterated that she consistently consulted with the Diocese regarding the correct action to take in response to MacKinnon but, despite the Diocese's approval to take action and contact the police, the Diocese unlawfully retaliated against her when the information became public. Rehfield alleged that her termination was in direct conflict with the Whistleblower Act's protections for employees who disclose information to law enforcement personnel.

¶ 20    In March 2018, the Diocese amended its combined motion to dismiss. In response to Rehfield's new count under the Whistleblower Act, the Diocese argued that it should also be dismissed pursuant to section 2-619(a)(9) of the Code because of the doctrine of ecclesiastical abstention.

¶ 21    In April 2018, Rehfield filed her opposition to the Diocese's combined motion to dismiss. Rehfield contended Illinois law was unclear as to whether employees employed under a contract can seek relief for common-law retaliatory discharge. Additionally, she argued that her position was not covered by the "ministerial exception."

¶ 22    In May 2018, the trial court granted the Diocese's combined motion to dismiss and dismissed Rehfield's amended complaint with prejudice. In issuing its ruling, the court stated:

"The Court finds [Rehfield] was employed pursuant to a contract as stated in the amended complaint, and the amended complaint does not allege she was employed at will. Common law retaliatory discharge claims may only be asserted by employees terminable at will. The Court abstains and must abstain from exercising its jurisdiction over both of [Rehfield's] claims in accordance with the doctrine of ecclesiastic abstention.

[Rehfield] was employed in a ministerial role as a spiritual and educational leader of St. Raphael School, and as such being responsible for the instruction, development and implementation of Catholic religious programming for both students and staff, the implementation of diocesan principles and the religious growth of the school staff. Accordingly, Counts 1 and 2 of the amended complaint are dismissed—are dismissed with prejudice."

¶ 23    This appeal followed.

¶ 25     On appeal, Rehfield argues that the trial court erred as a matter of law when it granted the Diocese's combined motion to dismiss. Specifically, she takes issue with the court's finding that (1) she could not pursue a claim for retaliatory discharge as a contractual employee and (2) the ecclesiastical abstention doctrine barred her claims. The Diocese argues that the court's rulings were proper. We first address Rehfield's second argument because we find that it is dispositive.

¶ 26     Section 2-619 of the Code lists several different grounds for which an involuntary dismissal may be granted. See 735 ILCS 5/2-619(a)(1) to (a)(9) (West 2016). Under subsection (a)(9), the subsection that applies in this case, a defendant may obtain an involuntary dismissal of a claim asserted against him if the claim is barred by other affirmative matter, which avoids the legal effect of or defeats the claim. *Id.* § 2-619(a)(9). An "affirmative matter" is something in the nature of a defense that negates the cause of action completely. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). Thus, the moving party admits the legal sufficiency of the complaint but asserts an affirmative defense or other matter to defeat the plaintiff's claim. *Id.* The defendant has the burden of producing the affirmative matter, and if such production is satisfied, the burden then shifts to the plaintiff to show that the affirmative matter is either unfounded or requires the resolution of essential, material facts before it is proven. See *In re Estate of Hanley*, 2013 IL App (3d) 110264, ¶ 55.

¶ 27     In ruling upon a section 2-619 motion to dismiss, the court must construe all of the pleadings and supporting documents in the light most favorable to the nonmoving party. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. On appeal, a dismissal pursuant to section 2-619 is reviewed *de novo*. When we conduct *de novo* review, we perform the same analysis as the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43.

¶ 28     Generally, the court, as a governmental agency of the State, is tasked with resolving disputes. *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713 (1991). Nonetheless, in matters of internal church disputes, its authority to do so is narrowly circumscribed by the first amendment's guarantee that the right to the free exercise of religion will not be abridged. *Id.* "The ecclesiastical abstention doctrine provides that civil courts may not determine the correctness of interpretations of canonical text or some decisions relating to government of the religious polity; rather, courts must accept as given whatever the religious entity decides." *Duncan v. Peterson*, 408 Ill. App. 3d 911, 915 (2010). However, where doctrinal controversy is not involved in a church dispute, the court may use the "neutral principles of law" approach, where the court examines pertinent church charters, constitutions and bylaws, deeds, state statutes, and other evidence and resolves the matter the same as it would a secular dispute. *Tanios*, 213 Ill. App. 3d at 713-15. Thus, the application of the ecclesiastical abstention doctrine depends on the subject matter of dispute. *Bruss v. Przybylo*, 385 Ill. App. 3d 399, 421 (2008).

¶ 29     Here, the subject matter of the dispute is the Diocese's termination of Rehfield's employment as principal. In *Williams v. Palmer*, 177 Ill. App. 3d 799 (1988), this court addressed whether the ecclesiastical abstention doctrine applied to employment disputes. The plaintiff in *Williams* was an ordained minister of the United Methodist Church and, prior to April 1984, served as pastor at a church in Chillicothe, Illinois. *Id.* at 800. He was later assigned to churches in Bryant and White Chapel, Illinois. *Id.* The plaintiff filed a complaint against the

Central Illinois Conference of the United Methodist Church for breach of contract for failing to follow certain provisions set forth in a document titled the "Book of Discipline" and tortious interference with his contractual rights. *Id.* at 800-01. The trial court dismissed the plaintiff's complaint for lack of subject-matter jurisdiction. *Id.* at 804-05. On appeal, this court affirmed the trial court's dismissal, holding that "[a]ppointment is undoubtedly an ecclesiastical matter to which judicial deference is mandated by the first amendment." *Id.* at 805.

¶ 30    Along those same lines, relying on *Gabriel v. Immanuel Evangelical Lutheran Church, Inc.*, 266 Ill. App. 3d 456 (1994), the Diocese argues that its subjective employment decisions, even if involving no religious beliefs, are not subject to court review.

¶ 31    In *Gabriel*, the plaintiff sued a church for breach of contract after it withdrew its offer to employ her as a parochial school kindergarten teacher. *Id.* at 457. The teacher alleged that the parties had entered into a contract, which was binding under civil contract law after the church made her an offer and she accepted the offer by signing it. *Id.* The trial court dismissed the complaint, finding that the ecclesiastical abstention doctrine applied because the contract in question was a religious document, replete with references to church doctrine, religious teachings, and church policies. *Id.* at 458. The court noted that such review would be impermissible, as it would consist of scrutinizing the church's decision-making process and subjective criteria used in reaching its decision. *Id.* On appeal, the Appellate Court, Fourth District, stated:

> "The decision of who should be appointed to speak for the church is an ecclesiastical matter to which judicial deference is mandated by the first amendment. [Citation.] Plaintiff is not a secular employee. Under the structure of the Missouri Synod, plaintiff is a parochial teacher who is designated as a commissioned minister of religion. The church's 'Diploma of Vocation,' which articulates the attributes of the 'call,' obligates plaintiff to a number of ecclesiastical duties and beliefs. While plaintiff is not 'clergy,' it has been stated '[a]s a general rule, if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship, he or she should be considered "clergy." ' [Citation.] It also does not matter that subjective employment-related decisions involve no religious beliefs. The first amendment precludes governmental interference with ecclesiastical hierarchies, church administration, and appointment of clergy. A church may adopt its own idiosyncratic reasons for appointing pastors and claim autonomy in the elaboration and pursuit of that goal. [Citation.] The factors relied upon by the church need not be independently ecclesiastical in nature; they need only be related to a pastoral appointment determination. [Citation.]" *Id.* at 459-60.

The *Gabriel* court concluded that, since the matter of whether to employ the plaintiff as a parochial schoolteacher was an ecclesiastical issue into which a civil court may not inquire, the trial court property dismissed the complaint. *Id.* at 460.

¶ 32    Employing the reasoning from *Williams* and *Gabriel*, Rehfield was not a secular employee. The Diocese's handbook stated the principal was tasked with, among other things, (1) providing an atmosphere in the school which was identifiable as Catholic; (2) developing and participating in ongoing programs to insure religious and professional growth of the staff; (3) establishing an instructional program which included religious education to meet the needs of students; (4) assisting teachers in achieving the goals of Catholic education through

supervision and classroom visitation; and (5) fostering good communication between parents, parish community, and other publics to promote good will. The job requirements of principal also required that the principal (1) be a committed, practicing Catholic, (2) be committed to nurturing the Catholic identity of the school, and (3) have the ability to function as the spiritual and educational leader in an elementary school. Thus, it is evident that Rehfield was a member of the clergy. See *id.* Based on the circumstances here, due to the wide discretion provided to churches by the ecclesiastical abstention doctrine when managing its representatives, the Diocese could terminate Rehfield, as a member of the clergy, for any reason without court interference, as review of that decision would involve court scrutiny of the Diocese's motivations, objectives, and principles. See *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1360 (D.C. Cir. 1990) ("any inquiry into the Church's reasons for asserting that [the minister] was not suited for a particular pastorship would constitute an excessive entanglement in its affairs").

¶ 33 Based on the foregoing, the ecclesiastical abstention doctrine applied to Rehfield's claims. Further, since this case involved the Diocese's subjective decision to terminate Rehfield's employment and did not involve church charters, constitutions and bylaws, deeds, state statutes, or other evidence that would resolve the matter the same as it would a secular dispute, we decline to employ the neutral principals of law approach. See *Tanios*, 213 Ill. App. 3d at 713-15. Last, because we find the ecclesiastical abstention doctrine applied to Rehfield's claims, we need not address the first issue she raises, namely whether claims for common-law retaliatory discharge are available to contractual employees. Thus, the trial court did not err when it granted the Diocese's motion to dismiss and dismissed Rehfield's complaint with prejudice.

¶ 34                                                        CONCLUSION

¶ 35 For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

¶ 36 Affirmed.