# Illinois Official Reports

## Appellate Court

---

*Midwest REM Enterprises, Inc. v. Noonan*, 2015 IL App (1st) 132488

---

| | |
|---|---|
| Appellate Court Caption | MIDWEST REM ENTERPRISES, INC., ALBERTO RAMIREZ, and WALTER MURPHY, Plaintiffs-Appellants and Cross-Appellees, v. MICHAEL NOONAN and RUTH NOONAN, Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-13-2488 |
| Filed<br>Rehearing denied<br>Modified upon<br>denial of rehearing | September 30, 2015<br>November 4, 2015<br><br>November 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-14563; the Hon. Brigid McGrath, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |
| Counsel on Appeal | Law Office of Joseph Gentleman, of Chicago (Donald L. Johnson and Julie A. Boynton, of counsel), for appellants.<br><br>Lewis Brisbois Bisgaard & Smith LLP, of Chicago (Danny L. Worker and Siobhán M. Murphy, of counsel), for appellees. |
| Panel | JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Presiding Justice Pierce and Justice Hyman concurred in the judgment and opinion. |

## OPINION

¶ 1     At least four lawsuits arose from a dispute over an agreement between Michael Noonan (Michael) and Midwest REM Enterprises, Inc. (REM) for REM to dump material on land Michael owned. In the lawsuit now on appeal, REM and two of its principals sued Michael and his wife, Ruth Noonan, for malicious prosecution, fraud, tortious interference with business relationships, and conspiracy. Plaintiffs claim primarily that Michael lied to investigators when he said he had not agreed to let REM dump on his property the kind of materials it dumped there. The Noonans moved to dismiss the lawsuit under the Citizen Participation Act (Act) (735 ILCS 110/1 *et seq.* (West 2010)).

¶ 2     The trial court's hearing on the motion to dismiss amounted to a trial on the merits of the complaint. When the trial court denied the motion to dismiss, the Noonans asked the court to give them seven days to file a motion for summary judgment. Plaintiffs filed a motion for voluntary dismissal before the Noonans filed their motion for summary judgment. The trial court initially granted the motion for voluntary dismissal, but the court reconsidered its decision, denied the motion for voluntary dismissal, and awarded Michael summary judgment on the complaint. The court also reconsidered its decision to deny Ruth's motion under the Act, and on reconsideration, it granted her motion to dismiss. The court awarded Ruth some attorney fees.

¶ 3     Plaintiffs appealed and the Noonans cross-appealed. We hold that the trial court did not abuse its discretion when it denied the motion for voluntary dismissal. The evidence supported the decision to deny Michael's motion to dismiss under the Act, but the evidence also supported the decision to enter summary judgment in Michael's favor. We find that the trial court applied the wrong standards when awarding Ruth attorney fees. Accordingly, we reverse the award of fees and remand for redetermination of the fee award. In all other respects, we affirm the trial court's judgment.

¶ 4                                    BACKGROUND

¶ 5     On December 2, 2002, a fire destroyed a building on Monitor Street in Chicago. Michael, the building's owner, hired REM to haul debris from the site. On November 10, 2003, inspectors from the city of Chicago determined that Michael had satisfactorily removed the debris and leveled the ground at the site. Walter Murphy, general manager of REM, told Michael that Michael needed to have an environmental expert inspect the property. Murphy recommended Timothy Lagousakos, who had a standing work relationship with REM. Michael hired Lagousakos.

¶ 6     Lagousakos found that petroleum had contaminated some of the soil on Michael's lot. Lagousakos thought that the contamination, especially with its location near a boiler room, indicated that a storage tank might lie underground on the property. He recommended excavating to look for a tank. In early 2004, Michael again hired REM, asking it this time to remove all the petroleum contaminated soil and to look for a tank. REM dug out more than 100 truckloads of muck, plus a number of truckloads of contaminated soil, but found no tank. At Lagousakos's suggestion, Michael instructed REM to dump the contaminated soil on asphalt on Michael's lot.

¶ 7     In 2004, Michael and Murphy agreed that REM would deliver some truckloads of appropriate material to Michael's lot. At that time, REM was also working on a project with Brandenburg Industrial Service Company. Northwestern University had hired Brandenburg to demolish a building, and Brandenburg had hired REM to haul away the debris along with many truckloads of sand from under the demolished building. REM asked for permission to use some of the material as fill for Michael's lot. REM showed Lagousakos a chemical analysis of some borings taken from Northwestern's land. Lagousakos read the report and, based solely on the report, gave his approval for using the material as fill on Michael's lot. In May and June of 2004, while Michael was in Ireland, REM dumped on Michael's lot 330 truckloads of material taken from Northwestern's site. REM spread the material across the lot and leveled it.

¶ 8     Ruth called Michael and told him that REM had dumped construction debris on his lot. Michael flew back to Chicago and inspected the site. Michael contacted REM and asked it to remove the debris. REM did not do so.

¶ 9     *Noonan v. REM*

¶ 10     On July 19, 2004, Michael sued REM and Brandenburg, asking the court to order REM and Brandenburg to remove the debris from Michael's lot. Michael alleged in his complaint:

> "9. In early May of 2004, [REM] requested permission from [Michael] to deliver approximately thirty truckloads of clean, compactable clay to the Subject Property. ***
>
> 10. [Michael] agreed to accept the approximately thirty truckloads of clean, compactable clay from the Northwestern project in order to level-off or grade the rear of the Subject Property.
>
> * * *
>
> 12. During his trip to Ireland, [Michael] and his agents contacted [REM] on several occasions to confirm that only clean, compactable clay would be delivered to the Subject Property."

REM, in its answer to the complaint, admitted paragraphs 9 and 10. In response to paragraph 12, REM answered that it "believes that it received several phone calls concerning the clean, compatible [*sic*] clay."

¶ 11     Michael asked Lagousakos to inspect the site again. Lagousakos visually inspected and photographed the site on July 24, 2004. He tested some samples of the material he found. He reported that "demolition building debris," "unsuitable as fill material," covered the site "to a depth of approximately 1-2 feet throughout the subject property." He specifically noted that he found "bricks, concrete, wood, metal, asphalt, etc." at the site. He also photographed a "[d]iscarded 55-gallon drum" in a debris pile on Michael's land.

¶ 12     Proceedings on Michael's complaint did not advance much by 2006. The alderman for the ward contacted the City of Chicago's (City) Department of the Environment to complain about the lot. The department's supervisor, Lafayette Robertson, went to the lot on August 30, 2006. He found waste construction debris covering the lot. The debris looked like the debris pictured in Lagousakos's report from 2004. Robertson found wood, tile, brick, metal and rebar in the debris. The material did not form an appropriate base for later construction. On September 12, 2006, the City issued a ticket to Michael, charging that he "caused and allowed the dumping of

waste construction," and holding him "responsible for the removal of dumped waste."

¶ 13                                                   *Chicago v. Brandenburg*

¶ 14        The City also issued tickets to Brandenburg and REM for their roles in dumping the waste on Michael's lot. Michael Lyne, a police officer working for the Department of Natural Resources, began an investigation concerning Michael's lot in April 2007. He found concrete with rebar, concrete with metal, brick, and tile spread across the lot.

¶ 15        On June 28, 2007, the City filed a complaint charging Brandenburg with hiring REM to illegally dump construction debris on Michael's lot. Lagousakos completed his testing of samples in July 2007. In his report, Lagousakos reiterated that in 2004 he found "pulverized building construction/demolition debris" spread across the lot. That material remained on the lot in 2007.

¶ 16        The City settled its case against Brandenburg in March 2008. Brandenburg agreed to remove and properly dispose of the construction debris dumped on Michael's lot. The settlement agreement called for the removal of 350 truckloads of construction and demolition debris. Brandenburg also agreed to pay a fine of $4,000. The City agreed to dismiss its complaint against Brandenburg. REM, working at no charge to Brandenburg, removed 350 truckloads of debris, in accord with Brandenburg's settlement with the City. In light of the settlement, Michael voluntarily dismissed his complaint against both Brandenburg and REM.

¶ 17                                                   *People v. REM*

¶ 18        The State filed a complaint against REM for illegal dumping, and the case proceeded to trial. The State chose not to call Michael as a witness. Instead, the State relied on the testimony of Lagousakos, Lyne, Robertson and Ruth. Murphy and Alberto Ramirez, president of REM, testified for the defense. In a written order dated April 16, 2010, the court entered a judgment against the State and in favor of REM. The court said:

> "Whether defendants are guilty of 'dumping' or 'abandoning' waste or construction debris at Monitor depends upon the court's acceptance of [Michael's] *in absentia* contention that he asked only for 30 loads of compactable clay and that defendants instead deposited 300 loads of construction debris on his property without his consent. ***
>
> But wholly apart from the lack of testimony from [Michael] at trial, which, in itself, is a virtually insurmountable hurdle for the State to overcome, the State has never attempted to articulate any motivation for [REM] to do what it is accused of doing. ***
>
> *** In short, the record fails to support the State's contention that [REM] had anything to gain by 'dumping' or 'abandoning' 300 loads of the material at Monitor. ***
>
> The record reflects that the material delivered by [REM] to Monitor was suitable for use as pre-construction fill. *** It is also apparent that the material contained such small amounts of concrete, rebar, wood, and pieces of 50-gallon drums, that it was unnecessary to strain it prior to shipping to a clean landfill. The court rejects, as not substantiated by the evidence, the State's contention that the material delivered to Monitor became 'waste' that was 'dumped' or 'abandoned' there because [REM] acted

without the landowner's permission."

¶ 19                                    *REM v. Noonan*

¶ 20    In December 2010, REM, Ramirez and Murphy filed a complaint against the Noonans to initiate the litigation presently before this court. REM alleged that in its complaint (in *Noonan v. REM*), Michael had falsely alleged:

"a. [Michael] had only requested 30 loads of fill to be dumped on his property;

b. That [REM] was to dump clay;

c. That [REM] had dumped demolition debris that included broken concrete, mortar, steel rebar, electrical conduit, telephone cables, stone flooring, ceramic blocks and steel on [Michael's] property;

d. That there was a gate securing the property that had been severely damaged by [REM]; and

e. That [REM] had dumped a 55-gallon drum on the property."

¶ 21    REM further alleged that Michael made false statements to Lyne, including the statements listed above, and he added "(a) [REM] was not authorized to dump anything on [Michael's] property; (b) [REM] had dumped 'waste' on [Michael's] property; and (c) [REM] had dumped fill that was not clean on [Michael's] property." REM claimed "[t]he material delivered by [REM] to [Michael's] property was suitable for use as pre-construction fill as requested by [Michael]." REM charged Michael with fraud and intentional interference with prospective economic advantage, and it charged Michael and Ruth with malicious prosecution and conspiring to defraud REM and interfere with REM's business.

¶ 22    In its only allegations involving Ruth, REM said:

"Ruth Noonan acted in furtherance of the conspiracy by testifying at the trial in [*People v. REM*] and falsely stating facts during that trial and otherwise acting in concert with her husband.

* * *

*** Ruth Noonan worked in concert with Michael Noonan based upon the fact she testified in [*People v. REM*] and stated that she had previously spoken to investigators."

¶ 23                            Motion to Dismiss *REM v. Noonan*

¶ 24    On April 1, 2011, the Noonans moved to dismiss plaintiffs' complaint based on the Act (735 ILCS 110/1 *et seq.* (West 2010)). Michael contended that REM filed the lawsuit to punish Michael for having won a settlement in accord with which REM cleaned the debris it dumped off of Michael's lot, and to punish Ruth for testifying for the State in *People v. REM*. Proceedings on the motion, including extensive discovery, lasted 2½ years.

¶ 25    The trial court held that, to decide the motion to dismiss, it needed to hear evidence on the allegations in the complaint. REM argued that the court's findings in *People v. REM* collaterally estopped Michael from presenting evidence or arguing that REM dumped on his property construction waste, not usable as fill for new construction. The trial court held that *res judicata* and collateral estoppel did not apply. The court accepted into evidence the transcript from the trial in *People v. REM*.

¶ 26    The transcript of that trial shows that Ruth testified that she visited Michael's lot in June 2004, and she saw construction debris, including bricks, wood and other building material. Lagousakos corroborated Ruth's testimony that, by July 2004, construction debris covered Michael's lot after REM finished dumping material there. The debris included concrete, broken bricks, tile and gravel.

¶ 27    Lyne testified that when he inspected the site in 2007, he found metal, tile, wood, brick, wire, pipes, and rebar. Lyne interviewed Ramirez, who admitted that no one had inspected the material shipped from Northwestern's site. Ramirez thought the fill could include concrete, tile and wood. Ramirez told Lyne that the fill counted as clean, and met Michael's request, as long as it included no hazardous waste. Lyne said that the material he found at the site, material Ramirez admitted that REM dumped, did not meet the State's definition of acceptable preconstruction fill.

¶ 28    Robertson testified that when he first visited Michael's lot in 2006, he found the lot unsecured. Neighbors complained about trucks dumping loads of debris on the lot in 2006. Robertson saw evidence of new dumping outside Michael's fence, but not on the leveled areas of the lot. Robertson watched when REM cleared the debris off the lot in 2008. REM screened the material before sending part of it to Earth, Inc.

¶ 29    Ramirez testified that he saw no wood, tile or rebar in the material REM shipped to Michael's lot. Ramirez said REM used the screener on the material for only one day. Earth, Inc., told him the material was so clean he did not need to bother screening it.

¶ 30    Although the trial court accepted the transcript from *People v. REM* into evidence, many of the same witnesses testified at the evidentiary hearing on the Noonans' motion to dismiss plaintiffs' complaint. The trial court commenced the hearing on June 1, 2011. The parties completed presentation of the evidence on August 31, 2011, at the end of the fifth day of evidentiary hearings. Lagousakos, Lyne, Ruth, Robertson, Ramirez, Murphy, and Anthony Guarnero, of Brandenburg, all testified again, mostly repeating the testimony they gave in *People v. REM*.

¶ 31    In addition to the witnesses who testified in both cases, Michael also testified. Michael said that fences surrounded his lot, but if Michael's neighbor left the gate in his fence open, dumpers could access Michael's lot. Robertson testified that he never found the gate in the neighbor's fence locked, so he considered Michael's lot unsecured. Robertson again emphasized that the fill he found at the site did not form an appropriate base for construction. In the context of questions about the construction debris Robertson found on Michael's lot, Michael's attorney asked, "Did [Michael] indicate to you that he had not, in fact, consented to the dumping of material on his site?" Robertson answered, "Yes."

¶ 32    Lyne testified that he found some separate piles of debris that someone probably dumped without Michael's permission. However, most of the construction debris appeared uniformly throughout the leveled areas of the lot, indicating that the construction debris likely came from a single source. Lyne showed Ramirez and Murphy photographs of the leveled lot, including construction debris. Ramirez and Murphy both admitted that the photographs showed the material REM shipped from Northwestern.

¶ 33    Ramirez testified that Michael asked for clean clay, and REM never brought clean clay to the lot. Ramirez admitted that once Michael saw the lot after the dumping, Michael immediately complained that he had not agreed to allow the dumping of construction debris on his lot. Ramirez also admitted that the loads REM dumped could have included bricks, cement,

tile and wood. In accord with the statement he made to Lyne, Ramirez admitted at trial that photographs of the site, showing tile, wood and pipe, showed materials REM dumped. Ramirez testified that Brandenburg, once one of REM's most regular customers, effectively stopped working with REM after Michael and the City sued REM and Brandenburg.

¶ 34   Murphy testified that he believed acceptable preconstruction fill for Michael's lot could include up to 15% garbage, which could consist of concrete, wood, glass, metal, plastic and tile.

¶ 35   The parties presented to the court numerous exhibits, including dated photographs of Michael's lot; photographs of Northwestern's site before REM cleared it, showing tile similar to the tile on Michael's lot; Brandenburg's contract with Northwestern, in which Brandenburg promised to remove materials used in the foundation of Northwestern's building; REM's contract with Brandenburg; Lagousakos's reports; the state inspector's report; and conservation department reports from 2007 concerning the lot. Michael presented an affidavit from a witness who saw REM trucks dump construction debris on Michael's lot in 2004. The witness specified that the debris included concrete, rebar, wires, tile, steel and wood. The trial court also accepted into evidence a transcript of Lyne's interview with Ramirez in 2007, when Ramirez admitted that REM did not inspect the fill before shipping it from Northwestern to Michael's lot, and that in his opinion, clean fill could include concrete, tile and wood, as long as it had no hazardous materials.

¶ 36   In December 2011, the parties submitted briefs on the motion to dismiss under the Act. At a hearing on April 11, 2012, the court said:

"I have the benefit of a full evidentiary hearing. And based on that, I conclude that plaintiffs' suit genuinely seeks relief for damages for alleged intentional tortious acts for purposes of the [Act]. *** It is clear from the record before the Court that plaintiffs' intent in bringing this suit is to recover damages for loss in business and costs of defense it perceives as being the result of the plaintiffs['] trespass suit [*Noonan v. REM*] and the subsequent State and local investigation and lawsuit, not to silence or chill the defendant's speech or protest activity. In its complaint against the defendants, the plaintiff alleges that in filing what we have been referring to as the trespass suit, the defendants made numerous allegations they knew to be false ***.

*** [I]t became clear that the [A]ct didn't apply to the plaintiffs' cause of action because it was a genuine suit for damages for perceived wrongdoing. As plaintiffs note, the plaintiffs' suit wasn't filed at any time around the time the defendants were seeking to assert their rights. *** But furthermore, the evidence discloses [an] instanc[e] where the defendants allegedly made misstatements to the investigating authorities; namely, that the plaintiffs had no permission to dump any material on the property at issue. *** And a lot of the arguments made by the defendants in favor of dismissing the suit under [the Act] were more akin to arguments in favor of summary judgment. So I am denying the motion to dismiss under the [Act], but the arguments regarding summary judgment are well taken. ***

*** [I]n litigating the motion to dismiss under the [Act], the parties basically tried the case and presented to the Court live testimony, testimony from the previous proceedings, along with a wealth of other evidence. ***

***

*** What the disagreement centers on is the content of the materials; i.e., what clean, compact[a]ble clay was to consist of. I think that the evidence is conclusive that the material dumped at the site contained rebar, concrete and cables. ***

***

*** [I]t is unsuitable as fill material that could be built on and would have to be removed prior to any construction activities. *** The evidence reflects that none of the allegations in this suit [Michael] filed are absolutely false. *** The fact that Mr. Noonan expected material that didn't contain debris and that plaintiffs may have assumed clean, compact[a]ble clay could contain a percentage of debris doesn't amount to a fraudulent intent or wrongdoing in filing the trespass complaint. *** [E]ven if clean fill could contain a percentage of building debris, Mr. Noonan's allegations that the fill on his property wasn't the fill he agreed to can form the basis of a trespass claim. *** The fly dumping was easily distinguishable ***. *** [T]here was no way *** that the materials that were spread here and are here could have been brought by anyone but [REM] because it was only six days between the time the materials were last dumped *** and Mr. Noonan returned to the property."

¶ 37    The court and the parties then discussed further proceedings:

"[Plaintiffs' attorney]: I am going to file an amended complaint ***.

THE COURT: *** I think the next step, based on all of the evidence we adduced and all of the time the parties spent, the next step then I would ask the defendants if they are going to be filing a motion for a summary judgment ***?

[The Noonans' primary attorney]: Yes, we will, Your Honor. The one thing we want to think about and talk to our client about is requesting an immediate appeal, which is not something I think we are ready to do.

[The Noonans' second attorney]: Though, I think that if the Court is going to entertain a summary judgment motion, we'd file that, brief it, and then depending on the Court's ruling, you know, maybe take an appeal of the whole thing.

THE COURT: That might be helpful, and it's going to be based upon the complaint that we have pending at this time.

* * *

*** This is all the evidence. We've had a trial in this case.

[Plaintiffs' attorney]: I will file a motion for leave to file an amended complaint. ***

[The Noonans' primary attorney]: Why don't we get our motion for summary judgment on file, seven days? Set a briefing schedule today."

¶ 38    Instead, the court set a status date for April 18, 2012, seven days after the hearing. The court denied the Noonans' motion to dismiss based on the Act.

¶ 39    The next day, April 12, 2012, the plaintiffs filed a motion for voluntary dismissal of their complaint. The Noonans filed their motion for summary judgment on April 17, 2012. At the status hearing on April 18, 2012, the trial court granted the motion for voluntary dismissal and dismissed the motion for summary judgment as moot.

¶ 40    The Noonans moved for reconsideration of the order of April 18, 2012. In an order dated September 21, 2012, the trial court vacated the April 18 order and permitted the parties to file

- 8 -

further briefs. On November 14, 2012, the trial court granted Ruth's motion to dismiss the lawsuit under the Act, but denied Michael's motion to dismiss. The court set Michael's motion for summary judgment for argument. Ruth filed a fee petition supported by her attorney's affidavit and exhibits showing the hours each attorney spent on Ruth's motion. Ruth sought more than $100,000 in fees and costs.

¶ 41 Plaintiffs moved for summary judgment against Michael and for reconsideration of the order granting a judgment in favor of Ruth. The court heard argument on those motions along with Michael's motion for summary judgment. The trial court granted Michael's motion for summary judgment and denied plaintiffs' motions in an order dated July 2, 2013. Plaintiffs filed a timely notice of appeal.

¶ 42 The trial court considered Ruth's fee petition at a hearing on September 20, 2013. The court said that if it awarded fees for work done for Michael, "we would run afoul of the rule that duplicative and excessive times not reasonably billed to one's own client cannot be billed to an adversary through a fee shifting statute." The court added:

> "[T]he main issue that this Court must contend with is that the main defendant, Mrs. Noonan's husband, did not prevail on his SLAPP motion and is not entitled to fees. *** I can award only those fees that were attributable to Mrs. Noonan's defense and that were not also attributed to Mr. Noonan. That is those fees that she alone had incurred.
>
> * * *
>
> For instance, in the general legal research, most of it would have been incurred, in any event, gathering and assimilating facts. Again, the very reports and documents *** and transcripts that concern Mrs. Noonan's protected interest also dealt with her husband's non-protected activities. None of the witnesses dealt solely with Mrs. Noonan, and she would have had to have testified, in any event, even had she not been named as a party.
>
> Now, I located only three entries that dealt with only Mrs. Noonan ***. These related to a post-hearing brief filed on behalf of her. ***
>
> *** [A]fter reviewing the records I'm awarding a total of $8,765 in fees and costs for time billed to Mrs. Noonan. I've determined that these were the fees incurred solely with regards to Mrs. Noonan's defense."

¶ 43 The court entered an order dated September 20, 2013, recording the award. Plaintiffs amended their notice of appeal to add the order of September 20, 2013, as an order challenged on appeal. On October 21, 2013, the Noonans filed a notice of cross-appeal, challenging the denial of Michael's motion to dismiss under the Act, and the decision to award Ruth only $8,765 in fees and costs.

¶ 44 ANALYSIS

¶ 45 Voluntary Dismissal

¶ 46 Plaintiffs argue that the trial court abused its discretion when it denied the motion for voluntary dismissal of the complaint. See *Quigg v. Walgreen Co.*, 388 Ill. App. 3d 696, 699 (2009). Both parties recognize *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54 (1990), as the controlling authority on the issue.

¶ 47 In *Fumarolo*, on May 30, 1989, the trial court entered an order allowing the defendants to file a motion for summary judgment by June 28, 1989. On June 26, 1989, the plaintiffs filed a

motion for voluntary dismissal of the complaint. The defendants filed their motion for summary judgment, as scheduled, on June 28, 1989. The trial court denied the motion for voluntary dismissal and entered a summary judgment in favor of the defendants.

¶ 48     The plaintiffs appealed, claiming that the Code of Civil Procedure (Code) protected their right to voluntary dismissal. Ill. Rev. Stat. 1987, ch. 110, ¶ 2-1009. The *Fumarolo* court noted that the decision in *Gibellina v. Handley*, 127 Ill. 2d 122 (1989), had affected the interpretation of section 2-1009. The legislature later amended section 2-1009 to reflect the *Gibellina* holding. Section 2-1009 now provides:

"(a) The plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or each such party's attorney, and upon payment of costs, dismiss his or her action or any part thereof as to any defendant, without prejudice, by order filed in the cause.

(b) The court may hear and decide a motion that has been filed prior to a motion filed under subsection (a) of this Section when that prior filed motion, if favorably ruled on by the court, could result in a final disposition of the cause.

(c) After trial or hearing begins, the plaintiff may dismiss, only on terms fixed by the court ***." 735 ILCS 5/2-1009 (West 2012).

¶ 49     The *Fumarolo* plaintiffs argued that "the actual filing of a potentially dispositive motion marks the point at which the right to voluntary dismissal is no longer absolute." *Fumarolo*, 142 Ill. 2d at 67. Because the *Fumarolo* defendants actually filed their motion for summary judgment two days after the plaintiffs filed their motion for voluntary dismissal, the *Fumarolo* plaintiffs contended, as the plaintiffs contend here, that the Code protected their right to voluntary dismissal.

¶ 50     The *Fumarolo* court said:

"The decisive factor in *Gibellina* was not that the defendant had actually filed a potentially dispositive motion, but was instead that the defendant had put a potentially dispositive motion before the court prior to the filing of the section 2-1009 motion. As this court said in *Gibellina*, 'the trial court may hear and decide a motion which has been filed *prior to* a section 2-1009 motion when that motion, if favorably ruled on by the court, could result in a final disposition of the case.' (Emphasis in original.) [Citation.] In *Gibellina*, the court's expressed concern was to prevent the undue delay and abuse of judicial resources that occur when a plaintiff dismisses a case 'in the face of' a potentially dispositive motion which would dispose of the action. [Citation.] As this court put it, '[i]t has become clear that the allowance of an unrestricted right to dismiss and refile an action in the face of a potentially dispositive motion is not only increasing the burden on the already crowded dockets of our courts, but is also infringing on the authority of the judiciary to discharge its duties fairly and expeditiously.' [Citation.] ***

Although the defendants had not yet actually filed their summary judgment motion, it is clear that a potentially dispositive motion was, as the trial court said, for all intents and purposes, before the court. The motion to voluntarily dismiss was plainly made 'in the face of' a potentially dispositive motion and was used to 'avoid a potential decision on the merits.' The purpose of the defendants' appearance on May 30 was to advise the court and the plaintiffs that they were seeking a prompt resolution of the issue by

- 10 -

summary judgment. It is clear from the record that the judge and the parties understood that there was to be a motion for summary judgment and that the motion and brief would be filed on June 28. In various proceedings after May 30, the trial court and the parties made references to the summary judgment motion. If the trial court had allowed the motion to dismiss, it certainly would have seriously jeopardized, if not prevented, a prompt resolution of the case on the merits. There was a prompt resolution of the case by the trial court on August 29.

   The trial court did not err in holding that a potentially dispositive motion was before the court prior to the filing of the plaintiffs' motion for a voluntary dismissal and under *Gibellina v. Handley* the court clearly had discretion to deny the plaintiffs' motion for a voluntary dismissal." *Fumarolo*, 142 Ill. 2d at 68-69 (quoting *Gibellina*, 127 Ill. 2d at 137-38).

¶ 51   We agree with the trial court that at the hearing on April 11, 2012, the Noonans sufficiently indicated their intention to file a motion for summary judgment, as the Noonans' attorney said, in court, they would file the motion for summary judgment by April 18, 2012. Thus, that dispositive motion was already before the court when plaintiffs filed their motion for voluntary dismissal, and therefore the trial court had discretion to decide the dispositive motion before considering the motion for voluntary dismissal.

¶ 52   We note that the Noonans had filed a dispositive motion to dismiss the complaint under the Act long before plaintiffs filed their motion for voluntary dismissal. Although the court denied the motion to dismiss, the time had not elapsed for filing a motion to reconsider the denial of the motion to dismiss. The Noonans later filed a motion to reconsider the denial of the motion to dismiss. Thus, the trial court had not completed proceedings on the initial dispositive motion at the time that plaintiffs filed their motion for voluntary dismissal.

¶ 53   We also note that the evidentiary hearing in the case had commenced long before plaintiffs brought their motion for voluntary dismissal. The parties do not discuss section 2-1009(c), but we do not see why that section would not apply. If it does apply, then plaintiffs had already lost the right to voluntarily dismiss the complaint under section 2-1009(a), and they could voluntarily dismiss the case only with the court's approval and under terms the court imposed.

¶ 54   Judicial economy especially warrants denial of the motion for voluntary dismissal here. As the trial court said, by April 11, 2012, the trial court had already heard a complete trial on the merits of plaintiffs' complaint. The trial court indicated its inclination to dispose of the case on the basis of the evidence presented. Here, as in *Fumarolo*, "[t]he motion to voluntarily dismiss was plainly made 'in the face of' a potentially dispositive motion and was used to 'avoid a potential decision on the merits.' " *Fumarolo*, 142 Ill. 2d at 69 (quoting *Gibellina*, 127 Ill. 2d at 137). The trial court correctly exercised its discretion to deny the motion for voluntary dismissal and to consider the cross-motions for summary judgment.

¶ 55                                    Michael's Cross-Appeal

¶ 56   Plaintiffs also contend that the trial court should not have granted Michael summary judgment on the complaint. Michael, in his cross-appeal, argues that the court should have granted his motion to dismiss the complaint under the Act. Because Michael's cross-appeal, if successful, would obviate the need to discuss the summary judgment the court entered in his favor on the merits, we will address the cross-appeal before reaching the issue of whether the evidence warranted the entry of summary judgment in favor of Michael.

¶ 57        The Act provides:

"Civil actions for money damages have been filed against citizens and organizations of this State as a result of their valid exercise of their constitutional rights to petition, speak freely, associate freely, and otherwise participate in and communicate with government. There has been a disturbing increase in lawsuits termed 'Strategic Lawsuits Against Public Participation' in government or 'SLAPPs' as they are popularly called.

The threat of SLAPPs significantly chills and diminishes citizen participation in government, voluntary public service, and the exercise of these important constitutional rights. This abuse of the judicial process can and has been used as a means of intimidating, harassing, or punishing citizens and organizations for involving themselves in public affairs.

It is in the public interest and it is the purpose of this Act to strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government; to protect and encourage public participation in government to the maximum extent permitted by law; to establish an efficient process for identification and adjudication of SLAPPs; and to provide for attorney's fees and costs to prevailing movants." 735 ILCS 110/5 (West 2010).

"§ 15. Applicability. This Act applies to any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.

Acts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2010).

"§ 20. Motion procedure and standards.

* * *

(c) The court shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." 735 ILCS 110/20(c) (West 2010).

"§ 25. Attorney's fees and costs. The court shall award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2010).

¶ 58        Our supreme court interpreted the Act in *Sandholm v. Kuecker*, 2012 IL 111443. The *Sandholm* court said:

" 'SLAPPs, or "Strategic Lawsuits Against Public Participation," are lawsuits aimed at preventing citizens from exercising their political rights or punishing those who have done so.' *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 630 (2010) (citing generally Penelope Canan & George W. Pring, *Strategic Lawsuits Against Public Participation*, 35 Soc. Probs. 506 (1988)). 'SLAPPs use the threat of money damages or the prospect of the cost of defending against the suits to silence citizen

- 12 -

participation.' *Walsh*, 238 Ill. 2d at 630 (citing 735 ILCS 110/5 (West 2008)). *** A SLAPP is 'based upon nothing more than defendants' exercise of their right, under the first amendment, to petition the government for a redress of grievances.' [*Westfield Partners, Ltd. v. Hogan*, 740 F. Supp. 523, 525 (N.D. Ill. 1990).]

SLAPPs are, by definition, meritless. John C. Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPs*, 26 Loy. L.A. L. Rev. 395, 396 (1993). Plaintiffs in SLAPP suits do not intend to win but rather to chill a defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction. *** While the case is being litigated in the courts, however, defendants are forced to expend funds on litigation costs and attorney fees and may be discouraged from continuing their protest activities. [Citation.]

*** SLAPPs 'masquerade as ordinary lawsuits' and may include myriad causes of action, including defamation, interference with contractual rights or prospective economic advantage, and malicious prosecution. Kathryn W. Tate, *California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope*, 33 Loy. L.A. L. Rev. 801, 804-05 (2000). Because winning is not a SLAPP plaintiff's primary motivation, the existing safeguards to prevent meritless claims from prevailing were seen as inadequate, prompting many states to enact anti-SLAPP legislation. *Id*. at 805. These statutory schemes commonly provide for expedited judicial review, summary dismissal, and recovery of attorney fees for the party who has been 'SLAPPed.' *Id*.

* * *

In deciding whether a lawsuit should be dismissed pursuant to the Act, a court must first determine whether the suit is the type of suit the Act was intended to address. *** ***

In light of the clear legislative intent expressed in the statute to subject only meritless, retaliatory SLAPP suits to dismissal, we construe the phrase 'based on, relates to, or is in response to' in section 15 to mean *solely* based on, relating to, or in response to 'any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.' 735 ILCS 110/15 (West 2008). Stated another way, where a plaintiff files suit genuinely seeking relief for damages for the alleged defamation or intentionally tortious acts of defendants, the lawsuit is not solely based on defendants's rights of petition, speech, association, or participation in government. In that case, the suit would not be subject to dismissal under the Act. It is clear from the express language of the Act that it was not intended to protect those who commit tortious acts and then seek refuge in the immunity conferred by the statute.

* * *

The procedure set forth in the Act provides the proper framework for our analysis. Section 15 requires the moving party to demonstrate that the plaintiff's complaint is 'based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.' 735 ILCS 110/15 (West 2008); [citation]. If the moving party has met his or her burden of proof, the burden then shifts to the responding party

- 13 -

to produce 'clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability' under the Act. 735 ILCS 110/20(c) (West 2008); [citation]. Thus, defendants had the initial burden of proving that plaintiff's lawsuit was solely 'based on, relate[d] to, or in response to' their acts in furtherance of their rights of petition, speech or association, or to participate in government. Only if defendants have met their burden does the plaintiff have to provide clear and convincing evidence that defendants' acts are not immunized from liability under the Act." (Emphasis in original.) *Sandholm*, 2012 IL 111443, ¶¶ 33-56.

¶ 59 Thus, the *Sandholm* court held that when a defendant seeks dismissal of a lawsuit under the Act, the defendant bears the burden of proving that the plaintiff has filed a meritless suit solely based on, related to, or in response to the defendant's participation in government. *Sandholm*, 2012 IL 111443, ¶¶ 48-56; see *Chicago Regional Council of Carpenters v. Jursich*, 2013 IL App (1st) 113279, ¶ 20.

¶ 60 In *Garrido v. Arena*, 2013 IL App (1st) 120466, the court explained the effect of *Sandholm*. When a defendant makes a motion to dismiss a complaint under the Act, the defendant usually concedes that the complaint adequately states a cause of action. *Garrido*, 2013 IL App (1st) 120466, ¶ 21; see *Sandholm*, 2012 IL 111443, ¶ 54. To show the complaint lacks merit, the defendant must "disprov[e] some essential element of plaintiff's *prima facie* case." *Garrido*, 2013 IL App (1st) 120466, ¶ 28.

¶ 61 Commentators on similar legislation from other states have argued that once a defendant has shown that a lawsuit attacks his participation in government, the plaintiff should bear the burden of presenting sufficient evidence to show that the lawsuit has merit. Tate, *supra*, at 838-41; Katelyn E. Saner, *Getting SLAPP-ed in Federal Court: Applying State Anti-SLAPP Special Motions to Dismiss in Federal Court After Shady Grove*, 63 Duke L.J. 781, 792 (2013) (if the defendant shows that a lawsuit arises from the defendant's participation in government, "the burden then shifts to the plaintiff to show that the plaintiff's claim is legally sufficient and that each element of the plaintiff's claim is supported by admissible evidence"). As Pring and Canan said, legislation to counter SLAPPs "must set out an effective early review for filed SLAPPs, shifting the burden of proof to the filer and, in so doing, serving a clear warning against the future filing of such suits." George W. Pring & Penelope Canan, SLAPPs: Getting Sued for Speaking Out 203 (1996). Barker, in a comment cited in *Sandholm*, observed that "[q]uick and early resolution of litigation is the single most important component of any court or statutory scheme to prevent SLAPPs. Expediting the SLAPP process will not only alleviate its chilling effect on defendants, but it will also create disincentives for plaintiffs seeking primarily to delay and distract their opponents. The earlier that threshold judicial review occurs, the less effective the SLAPP will be." Barker, *supra*, at 408. Tate, another commentator our supreme court cited, echoed the observation: "To be of benefit to SLAPPees, the procedure for deciding the motion is supposed to be fast and inexpensive." Tate, *supra*, at 840. One commentator argued that by reading the word "solely" into the Act and shifting the burden of proof to the defendant to show that the plaintiff filed a meritless lawsuit, the *Sandholm* court "effectively nullified the Illinois Citizen Participation Act." Emily L. Jenkinson, *Sandholm v. Kuecker: The Illinois Supreme Court "SLAPPS" Away a Protection of Illinois Citizens' First Amendment Rights*, 63 DePaul L. Rev. 1093, 1093 (2014).

- 14 -

¶ 62    Under *Sandholm*, to show that the Act applied, Michael bore the burden of proving that the plaintiffs' complaint had no merit. The trial court found that it needed to hear the evidence–to hold a full trial on the merits of the complaint–before it could determine whether the complaint (which, like most SLAPPs, adequately stated a cause of action) had any merit. The court also needed to determine whether the complaint served any purpose other than punishing Michael for suing REM and Ruth for talking to City inspectors about the materials REM dumped on Michael's lot. Proceedings on the motion to dismiss under the Act included extensive discovery and years of legal maneuvering.

¶ 63    The trial court found facts and drew conclusions of law in support of its decision not to grant Michael's motion under the Act for dismissal of the complaint. We review the factual findings under the manifest weight of the evidence standard. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). We review the conclusions of law *de novo*. *Hammons v. Society of Permanent Cosmetic Professionals*, 2012 IL App (1st) 102644, ¶ 13.

¶ 64    The trial court found that "plaintiffs' intent in bringing this suit is to recover damages for loss in business and costs of defense it perceives as being the result of the plaintiffs['] trespass suit and the subsequent State and local investigation and lawsuit." The court also found arguable merit to the plaintiffs' claim, as the court said, "the evidence discloses [an] instanc[e] where the defendants allegedly made misstatements to the investigating authorities; namely, that the plaintiffs had no permission to dump any material on the property at issue." Ramirez testified that REM lost business as a result of the lawsuit Michael filed. Thus, the trial court's finding, that the desire to recover for lost business formed at least a part of the motive for suing Michael, is not contrary to the manifest weight of the evidence. The *Sandholm* standards required the trial court to deny Michael's motion to dismiss the plaintiffs' complaint under the Act. On Michael's cross-appeal, we affirm the trial court's denial of Michael's motion to dismiss the complaint under the Act.

¶ 65                                      Summary Judgment

¶ 66    Next, plaintiffs argue that the trial court erred when it granted summary judgment in favor of Michael. We review the order granting summary judgment *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Plaintiffs attempted to state four causes of action against Michael: (1) fraud; (2) tortious interference with a prospective business relationship; (3) malicious prosecution; and (4) conspiracy. We note that plaintiffs do not set forth in their brief the elements of any of the causes of action, and they make no effort to show that they have presented at trial sufficient evidence to make out a *prima facie* case for relief under any of their stated causes of action.

¶ 67                                             Fraud

¶ 68    To prove fraud, a plaintiff must show "that a false statement of material fact was made, that the party making the statement knew or believed it to be untrue, that the party to whom the statement was made had a right to rely on it and did so, that the statement was made for the purpose of inducing the other party to act, and that reliance by the person to whom the statement was made led to his injury." *Redarowicz v. Ohlendorf*, 92 Ill. 2d 171, 185-86 (1982). Plaintiffs allege only that Michael made false statements to Robertson and Lyne, and again in the complaint. Plaintiffs presented no evidence that they relied on any of Michael's allegedly false statements, and, therefore, the trial court properly granted a judgment in favor of Michael

on the fraud count. See *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980); *Small v. Sussman*, 306 Ill. App. 3d 639, 646 (1999).

¶ 69                                Tortious Interference

¶ 70     "[T]o prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991). The "purposeful interference" element requires the plaintiff to show "that the defendant has committed some impropriety" that interfered with the expectancy. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 485 (1998). Plaintiffs here alleged two improprieties: Michael filed a frivolous lawsuit against REM and Brandenburg, and Michael made false statements to Lyne and Robertson.

¶ 71     REM admitted that Michael asked REM to deliver clean clay as preconstruction fill, and that it did not deliver clean clay. The admissions show that Michael filed a meritorious suit against REM. Because REM arguably acted as Brandenburg's agent for disposing of the construction debris, Michael did not act frivolously when he named Brandenburg as a defendant. See *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 556 (1980) (a defendant commits a trespass by "causing a thing or a third person to enter the land of another"). REM did not present evidence that could support a finding that Michael acted frivolously or improperly when he sued REM and Brandenburg for dumping construction debris on his lot without his permission.

¶ 72     REM claims that Michael lied to Lyne and Robertson. REM relies primarily on the findings of the criminal court in *People v. REM*. REM argues that the decision collaterally estops Michael from presenting evidence that he told the truth to Lyne and Robertson.

¶ 73     Michael did not take part in *People v. REM*. For collateral estoppel to apply, Michael, the party against whom plaintiffs assert the estoppel, must be in privity with the State, the party to the prior adjudication. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390 (2001). Many courts have relied on the following definition for privity:

> " 'Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties.' " *People ex rel. Burris v. Progressive Land Developers, Inc.*, 151 Ill. 2d 285, 296 (1992) (quoting Restatement of Judgments § 83, cmt. a, at 389 (1942)).

¶ 74     The appellate court expanded on the meaning of privity in *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548 (2009):

> "The Restatement (Second) of Judgments explains that ' "privity" refers to a cluster of relationships, [citation], under which the preclusive effects of a judgment extend beyond a party to the original action and apply to persons having specified relationships to that party.' Restatement (Second) of Judgments, Introduction, at 1 (1982). The Restatement (Second) further explains that there are three general categories of relationships that may establish privity. Restatement (Second) of

Judgments §75, Comment *a*, at 210 (1982); see also *Diversified Financial Systems, Inc. v. Boyd*, 286 Ill. App. 3d 911, 916 (1997) (also discussing the Restatement (Second) of Judgments). The first category includes relationships that are 'explicitly representative,' which includes: (1) the trustee of an estate or interest of which the nonparty is a beneficiary; (2) a person invested by the nonparty with the authority to represent the nonparty in the action; (3) the executor, administrator, guardian, conservator, or similar fiduciary manager of an interest in which the nonparty is a beneficiary; (4) an official or agency invested by law with the authority to represent the nonparty; or (5) the representative of a class of persons similarly situated, designated as the class representative by the court, of which the nonparty is a member. Restatement (Second) of Judgments §§41, 75(1) & Comment *a* (1982). The second category of relationships includes 'an array of substantive legal relationships,' referred to in sections 45 through 61 of the Restatement (Second) of Judgments, in which one of the parties to the relationship is 'treated as having the capacity to bind the other to a judgment in an action to which the latter is not a party.' Restatement (Second) of Judgments §75(2), Comment *a*, at 210 (1982). These relationships include, *inter alia*, co-obligors, parties who are vicariously liable for one another, bailees and bailors, co-owners of property, assignees and assignors, the promisee and intended beneficiary of a contract, corporations and their officers, directors, and shareholders, and members of partnerships. See Restatement (Second) of Judgments §§45 through 61 (1982). The third category of relationships includes successors in interest to property. Restatement (Second) of Judgments §75(3) & Comment *a* (1982)." *State Farm*, 394 Ill. App. 3d at 559-60.

¶ 75    The State did not explicitly represent Michael's interests. It represented only the State's interest in maintaining a reasonably clean environment. The State has no vicarious liability for Michael's acts; Michael did not act as a co-owner with the State; Michael did not create a bailment; and Michael did not succeed to the State's interest in the property. The ticket the State issued to Michael, charging him with responsibility for cleaning the debris off his lot regardless of how the debris came to the lot, establishes that the State had interests adverse to Michael's interests and that the State did not represent Michael. Because of the lack of privity between Michael and the State, the trial court properly held that the decision in *People v. REM* had no estoppel effect in *REM v. Noonan*. The trial court correctly considered the evidence presented in *People v. REM* as evidence in *REM v. Noonan*, and the trial court correctly found that the criminal court's conclusions had no binding effect for the proceedings on REM's complaint.

¶ 76    The evidence at the trial on the motion to dismiss showed that Michael truthfully told Lyne and Robertson that REM dumped hundreds of truckloads of material from Northwestern on his lot. Ramirez told Lyne, as recorded in the transcript of their interview, that REM dumped on Michael's lot uninspected fill from Northwestern's site, and the fill could include concrete, tile and wood. Photographs taken in 2004, and a report from Lagousakos, in 2004, show that the fill dumped on Michael's lot included construction debris, with rebar, cables, and electric wire. Both Ramirez and Murphy admitted that the photographs accurately depicted materials REM dumped. The evidence showed that Michael requested compactable clay from REM and he told investigators and the court that he requested compactable clay; that REM instead dumped construction debris that included concrete, rebar, electrical conduit, cables and ceramic tile;

- 17 -

and that Lagousakos found a 55-gallon drum on the lot. REM presented no evidence at all to support its allegations that Michael falsely told investigators the debris included mortar. REM presented no evidence to show that Michael falsely alleged that REM damaged a gate protecting his property.

¶ 77     In effect, plaintiffs sought to prove two inconsistent accounts of the dumping. On the one hand, plaintiffs emphasized that fly dumpers had access to the property through a gate that Robertson always found unlocked when he visited from 2006 to 2008. Plaintiffs claimed that the fly dumpers could have left the tile (which looked strikingly similar to the tile used in Northwestern's demolished hospital), cables, rebar, concrete and wood found at the site. The problem with this account is that Lagousakos, Lyne and Robertson testified, without contradiction, that the construction debris did not appear only in the separate piles of debris that apparently resulted from fly dumping. Construction debris covered the leveled portions of the lot.

¶ 78     On the other hand, plaintiffs argue that the fill they removed from the lot, in accord with the settlement between Brandenburg and the City, had virtually no construction debris, and they needed no screening to clean it before shipment to Earth, Inc., which accepted only clean fill. In light of the photographs, and reports by Lagousakos, Lyne and Robertson, plaintiffs apparently ask the court to believe that they dumped clean preconstruction fill, with no significant rebar, cables, wood or tile, and they spread that fill evenly over the lot. Someone else then entered through the unlocked gate, dumped construction debris, spread the debris evenly over the lot and leveled the lot for the photo opportunities and City inspection. Then, after the inspection and photographs, someone cleared the construction debris off the lot and left behind only clean preconstruction fill, which REM found on the lot before it started shipping the 350 truckloads off the lot in accord with the settlement in *Chicago v. Brandenburg*. The account makes no sense. On the evidence presented at trial, no reasonable trier of fact could find that Michael lied to investigators or the court about the dumping of construction debris on his lot, and what he found on the lot after REM finished their dumping. Accordingly, we hold that the trial court correctly granted Michael's motion for summary judgment on the tortious interference claim.

¶ 79                              Malicious Prosecution

¶ 80     For the malicious prosecution claim, plaintiffs needed to show "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Ritchey v. Maksin*, 71 Ill. 2d 470, 475 (1978). Michael sued REM for trespass, and the State prosecuted REM for illegal dumping. The evidence shows ample probable cause for both lawsuits, and no evidence could support a finding that Michael and the State lacked probable cause to sue REM for dumping construction debris on Michael's lot. Accordingly, we hold that the trial court correctly entered summary judgment for Michael on the claim for malicious prosecution.

¶ 81                                    Conspiracy

¶ 82     Our supreme court defined "civil conspiracy" as "a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful

- 18 -

purpose by unlawful means." *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill. 2d 12, 23 (1998). "In order to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133 (1999). Plaintiffs alleged that Michael conspired with another to commit the torts of fraud, tortious interference with a prospective business advantage, and malicious prosecution. Because the evidence supported the decision to award summary judgment in Michael's favor on the three charged torts, the conspiracy claim also must fail. The trial court correctly granted Michael's motion for summary judgment on the complaint.

¶ 83                                       Ruth's Cross-Appeal

¶ 84        Plaintiffs argue that we should not address Ruth's cross-appeal because she did not include her notice of appeal in her brief, she did not attach a copy of the order appealed, and she did not identify the standard of review. Plaintiffs cite no authority for this argument. They apparently rely on Supreme Court Rules 341(h)(4) and (h)(9). Ill. S. Ct. R. 341(h)(4), (h)(9) (eff. Feb. 6, 2013). However, Rule 341(i) expressly provides, "The brief for the appellee and other parties shall conform to the foregoing requirements [of Rule 341], except that items (2), (3), (4), (5), (6) and (9) of paragraph (h) of this rule need not be included except to the extent that the presentation by the appellant is deemed unsatisfactory." Ill. S. Ct. R. 341(i) (eff. Feb. 6, 2013). Plaintiffs do not explain why this court should deem unsatisfactory their presentation of the notice of appeal and copy of the order appealed. Accordingly, we find no basis in the rules for rejecting Ruth's cross-appeal from the award of fees.

¶ 85        The trial court awarded Ruth $8,765 in costs and fees for her attorneys' work on the motion to dismiss under the Act. The abuse of discretion standard applies to our review of the award of statutory attorney fees. *Westchester Fire Insurance Co. v. G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 636 (2000). The Act provides that "[t]he court shall award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2010). The trial court expressly decided not to award Ruth all fees incurred in connection with the motion to dismiss. Instead, the court awarded her only "those fees that were attributable to Mrs. Noonan's defense and that were not also attributed to Mr. Noonan."

¶ 86        Plaintiffs argue that the trial court erred when it awarded fees and costs to Ruth because the court should not have dismissed the claims against Ruth. Regarding Ruth, plaintiffs alleged in their complaint only that she spoke to investigators and testified falsely at the trial in *People v. REM*. The complaint against Ruth, like many SLAPPs, attacked her for "testifying in judicial proceedings" and "reporting violations of law to government authorities." George W. Pring, *SLAPPs: Strategic Lawsuits against Public Participation*, 7 Pace Envtl. L. Rev. 3, 13 (1989), *available at* http://digitalcommons .pace.edu/pelr/vol7/iss1/2. Plaintiffs explicitly based their claims against Ruth on her acts in furtherance of her right to participate in government. See 735 ILCS 110/15 (West 2010). The complete absence of evidence that Ruth said anything untrue to investigators or the court shows both that plaintiffs filed a meritless claim against Ruth and that they named her as a defendant solely to punish her for her participation in government.

¶ 87        Thus, the Act required the court to award Ruth "reasonable attorney's fees and costs incurred in connection with the motion." 735 ILCS 110/25 (West 2010). Plaintiffs argue that

- 19 -

Ruth incurred no fees because Michael's insurer paid her attorneys, and the insurer did not plan to seek reimbursement from Ruth. But even if another party paid the fees on Ruth's behalf, Ruth incurred the fees. See *In re Marriage of Brockett*, 130 Ill. App. 3d 499, 501 (1984).

¶ 88      In *Brockett*, the Legal Assistance Foundation paid the petitioner's attorney fees, and the foundation did not plan to recover the fees from the petitioner. *Brockett*, 130 Ill. App. 3d at 501. The trial court denied the petitioner's request for attorney fees on grounds that she did not incur the fees. The *Brockett* court reversed, holding that "although petitioner may have no obligation to pay her attorney," she had incurred the fees. *Brockett*, 130 Ill. App. 3d at 501. We find Ruth's petition for fees indistinguishable from the petition in *Brockett*. Ruth incurred fees for defending against plaintiffs' lawsuit, and the Act mandated an award of appropriate fees. 735 ILCS 110/25 (West 2010).

¶ 89      For determination of appropriate fees, we look to precedent involving other statutes that permit the award of fees to a successful party. Under the Civil Rights Act (42 U.S.C. § 1988 (2012)), federal courts have held that "legal services fairly devoted to successful claims are compensable even though those very same legal services also supported the prosecution of the unsuccessful claims." *Hughes v. Repko*, 578 F.2d 483, 487 (3d Cir. 1978). In *Hughes*, the plaintiffs sued two defendants and won a judgment against only one. The *Hughes* court held that compensation for the plaintiffs should include fees for all services needed for prosecution of the successful claim, even though the same services also supported the unsuccessful claim. *Hughes*, 578 F.2d at 487.

¶ 90      Adopting the *Hughes* standard, we find that the trial court should have awarded Ruth all fees reasonably necessary for presentation of her motion to dismiss, even though many of the legal services used in preparing that motion also assisted in the presentation of Michael's unsuccessful motion to dismiss. The trial court reasoned that it should attribute most fees solely to Michael, and not to Ruth, even though the services helped Ruth win her motion, because Michael "was clearly the main defendant." As the court observed, "None of the witnesses dealt solely with [Ruth]," whose "role in the underlying facts was relatively minor. She reported to an investigating officer what she witnessed, and she testified at trial pursuant to a subpoena." But these same observations formed the basis for the ruling in favor of Ruth. Against Michael, plaintiffs could present at least an arguably meritorious claim, but against Ruth they presented no evidence to defeat her motion to dismiss. To show that the claims against her lacked arguable merit, Ruth had to endure a lengthy evidentiary hearing–a hearing where, as the trial court said, "the parties basically tried the case." At the conclusion of its ruling on the motion to dismiss under the Act, the trial court repeated the observation: "We've had a trial in this case."

¶ 91      We reverse the award of fees and order the trial court on remand to reconsider that award in light of the *Hughes* standard, which we find applicable to awards under the Act.

¶ 92                                 CONCLUSION

¶ 93      In light of the trial court's scheduling of a date for filing the Noonans' motion for summary judgment before plaintiffs filed the motion for voluntary dismissal, we find that the trial court did not abuse its discretion when it denied plaintiffs' motion for voluntary dismissal. The evidence sufficiently supports the trial court's finding that plaintiffs did not sue Michael solely to harass him for suing them, so we affirm the trial court's denial of Michael's motion to dismiss the complaint under the Act. The evidence also supports the decision granting Ruth's

motion to dismiss under the Act and Michael's motion for summary judgment on the complaint. We reverse only the award of fees to Ruth, finding that the trial court applied incorrect standards when it awarded fees to Ruth.

¶ 94       Affirmed in part, reversed in part, and remanded.